# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-00447-SCT

*DERRICK ARTHUR BURDETTE*

**v.**

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/2012 |
| TRIAL JUDGE: | HON. SMITH MURPHEY |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/28/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     Derrick Burdette was indicted and tried in the Circuit Court for the Second Judicial District of Panola County for the murder of Herman Smith. The jury acquitted Burdette of murder but found him guilty of the lesser offense of manslaughter. Burdette was sentenced to a twenty-year term in the custody of the Mississippi Department of Corrections (MDOC), to run consecutively with a sentence he already was serving for an unrelated offense. On appeal, Burdette asserts two assignments of error: (1) that the jury verdict was against the

overwhelming weight of the evidence, and (2) that his Confrontation Clause rights were violated at trial. We find that the jury verdict was not against the weight of the evidence. While we do find error amounting to the violation of Burdette's right to confront the witnesses against him, the error did not result in a manifest miscarriage of justice. Accordingly, we affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS IN TRIAL COURT

¶2.     On the evening of January 26, 2011, Kenyada Smalley, a resident of Still Trailer Park in Batesville, called the police to report a shooting at the trailer park. The victim, Herman Smith, who used the nickname "Old School," was the boyfriend of Kenyada's mother, Cynthia Smalley.[1] Officer Jeremy Haley of the Batesville Police Department (BPD) was first on the scene. When Officer Haley arrived, Cynthia was leaning into a gray Pontiac in which Smith was sitting on the driver's side; Smith had suffered several gunshots and was conscious and alert, but apparently in great pain.  From the record, it is unclear into which side of the car the officers observed Cynthia leaning.

¶3.     BPD Lieutenant Ruby Myers arrived on the scene next and encountered Smith, who was still sitting in the gray Pontiac, having suffered several gunshots. Smith was clearly in pain, but remained alert and conscious. When Myers asked Smith who had shot him, he stated that it was a person called "Scooter," and Smith further identified this person as Derrick Burdette, the defendant. Myers recorded this conversation with her "body mike," and a recording of this exchange later was played for the jury. Several shell casings were found

---

[1]To avoid confusion, Kenyada Smalley and Cynthia Smalley will be referred to by their first names.

2

on the ground near a passenger door of the car, on the driver's side floorboard, and in the center console of the car. No weapons or drugs were found inside the car.[2] Cynthia was still present at the vehicle when Myers arrived. By the time of trial, Cynthia had passed away. BPD Detective George Williford collected shell casings and bullets that he and other officers found at the scene, and these were entered into evidence. All of the casings were determined to be .380 casings. Williford found no weapon or drugs in Smith's car, but he agreed with defense counsel that such items potentially could have been removed before the police arrived.

¶4.    Smith was taken by ambulance to the hospital, where Murdis Smith, the victim's mother, was permitted to talk to him. Smith informed his mother that "Scooter" had shot him, and she so testified at trial.  Smith also spoke to Detective Williford and informed him that he had been shot by "Scooter;" he was able to identify a photograph of Burdette.  That night, Smith's condition declined and he died. Dr. Paul McGarry, an expert in forensic pathology, performed an autopsy on Smith's body.  At trial, he testified that the cause of death was "continuing internal bleeding due to multiple gunshot wounds." Dr. McGarry also recovered three bullets from Smith's body, which he transferred to Detective Williford, who entered them into evidence.

¶5.    Four individuals, Robert Walker Jr., Shawanda Rushing, Latisha Curry, and Tim Curry,[3] all initially denied having been at the scene of the crime that night.  All four later

---

[2]However, the defense notes that Smith was conscious and suggests that he could have handed incriminating items to Cynthia when she leaned inside the car.

[3]Again, to avoid confusion, Latisha Curry and Tim Curry will be referred by their first names.

admitted having ridden to the trailer park from Crenshaw with Burdette, and all four testified for the State at trial. Three of the four used drugs on the trip; the exception was Latisha, who was seven months pregnant. All agreed that the purpose of the trip was to buy drugs or pills from Smith. Walker accompanied Burdette to meet Smith. Walker testified that he got to Smith's car first, and then Burdette shoved him out of the way and shot Smith, stating "I told you I was going to get you." Walker did not notice a gun on Smith, and he identified Burdette's pistol as chrome with a black handle. Latisha testified that she heard gun shots and saw that Burdette's eyes were red when he returned to the vehicle. Latisha asked Burdette if it was him they had heard shooting, and he answered "yes."

¶6. Anthony and Fred Curry,[4] Burdette's brothers, were not present at the scene but were both aware that Burdette recently had purchased a pistol. Fred stated that, the day of the shooting, Burdette had left the courthouse in Sardis and had stated nonchalantly that "he was going to kill somebody," and Fred had believed him to be kidding.[5] The day after the shooting, Burdette called a family meeting and announced that he had killed someone, but he did not make any claim at this meeting that he was defending himself at the time of the killing. Burdette asked Anthony to help him dispose of the weapon, but Anthony refused. Fred eventually disposed of the weapon by transporting it to Burdette's cousin, Kendrick

---

[4]Anthony Curry and Fred Curry will be referred to, respectively, as Anthony and Fred.

[5]Burdette apparently was at the Panola County Courthouse in Sardis (First Judicial District of Panola County) to answer to a separate criminal charge, but this is not fully explained in the record.

4

Harris, also known as "Ken," in Water Valley. Detective Williford eventually was able to recover this weapon, a Sig Sauer nine-millimeter handgun, from Water Valley.

¶7. The day following the shooting, January 27, 2011, Deputy Earl Burdette[6] took Derrick Burdette into custody, and he was charged with the murder of Herman Smith. Burdette initially made a statement that he was not involved in the shooting and was not even in Batesville at the time. On February 10, 2011, Burdette for the first time admitted to the police, via a written letter, to having shot Smith. Burdette stated that Smith had a weapon and that Smith had drawn this weapon on him first, and that Burdette had responded in self-defense by pulling his own weapon and shooting Smith.

¶8. Quinton Tellis, who was Burdette's cellmate in the Panola County Jail for a three-month period, testified that, prior to the shooting, Smith had shown Tellis his .380 pistol and stated that the gun was "to protect himself from Scooter [Burdette]." Tellis testified that Smith had told him that Burdette had tried to rob him, and that Burdette also had sprayed Smith with mace. James Fletcher, an acquaintance of both Smith and Burdette, testified that in a December 26, 2010, phone call, Fletcher had informed Burdette that Smith was threatening to kill him. He stated that this warning was consistent with "the word out on the street." Fletcher also claimed to have engaged in a conversation with Smith, wherein Smith stated an intention to kill Burdette because Burdette previously had sprayed him with mace.

---

[6]Deputy Earl Burdette is Derrick Burdette's cousin.

Ladarius Harris, another mutual acquaintance of Burdette and Smith,[7] also testified that Smith had threatened to kill Burdette and that he personally had seen Smith's .380 pistol.

¶9. At trial, Burdette took the stand in his own defense. He gave a version of events different than that laid out by Robert Walker and by the victim, Herman Smith, after the shooting and prior to his death. According to Burdette, bad relations had arisen between him and Smith in a prior drug deal. Later, someone broke a window in Smith's car and Smith blamed Burdette. Also, Burdette stated that he knew that Smith had a weapon, and that Smith had threatened him. Nevertheless, when Burdette called Smith on January 26, 2011, his only intention was to buy drugs or pills. When Burdette and Walker approached the car, Smith began cursing Burdette and demanding money. Walker moved out of the way, and Burdette leaned into the car.

¶10. Burdette testified that Smith then pulled a pistol on him, and that this made him feel confused and scared and caused him to fear for his life. Burdette stated that he pretended to reach for money, but instead pulled his pistol. He stated that he pulled the trigger once, and the gun emptied. Burdette noticed drugs and a gun in Smith's car. Burdette claimed that he never intended to kill Smith, and specifically denied saying "I told you I was going to get you," as testified by Walker. Burdette stated that the eyewitness, Walker, was standing between thirty and forty-five feet away at the time of the shooting, and that he could not have heard anything that either Burdette or Smith said. Burdette further claims that the reason that he failed to mention to his family that he acted in self-defense, and that he denied

---

[7]Harris stated on cross-examination that he was a member of Burdette's family, although the record does not show the exact relationship between them.

involvement to the police for nearly two weeks following his arrest, was because he was still confused and shaken.

¶11.   Detective Williford was allowed to testify in two instances to information that Burdette alleges constituted Confrontation Clause violations.  In the first instance, Williford testified to efforts made to verify that the nine-millimeter Sig Sauer handgun, which undisputedly was the weapon used in the homicide, was able to fire .380 casings.  Williford stated that "we contacted the company that manufactured it and they definitely agreed with that and were in the process of sending us a letter and we never received the letter stating that it does shoot both bullets."  Neither the "we" who contacted the company nor the "they" at the company who responded was identified, and there is no indication that either party testified at trial.  Burdette made no objection to this testimony at trial.

¶12.   In the second instance complained of, Williford testified to the results of the Mississippi Crime Laboratory's analysis of some of the casings and projectiles in question.  Williford stated that the crime lab's results showed that all seven casings found and four of the bullets found definitely were fired from the gun in question, and the other bullets were consistent with having been fired by the gun in question but could not be definitively included nor excluded.  After this testimony, the crime lab report was admitted into evidence without objection.  No individual involved with the testing of the bullets or with the crime lab testified at trial.

¶13.   The State was allowed to call Detective Barry Thompson of the Panola County Sheriff's Department as a rebuttal witness.  Thompson testified that he is personally familiar

7

with the Sig Sauer nine-millimeter handgun, and that it is capable of firing .380 ammunition.[8]

He also stated that he had fired Sig Sauer handguns tens of thousands of times in his life, and that he had never seen one that would fire more than one time with a single pull of the trigger. However, he testified that if the shooter were "scared, nervous, or anticipating," he might pull the trigger more times than he thought he had.

¶14.    The jury acquitted Burdette of murder but found him guilty of the lesser offense of manslaughter. On January 30, 2012, Burdette filed a motion for judgment *non obstante verdicto* (JNOV) or, in the alternative, for a new trial, challenging the weight of the evidence. A sentencing hearing was held on March 1, 2012, and the court sentenced Burdette to serve twenty years in the custody of the MDOC, to run consecutively with a sentence that Burdette already was serving for an unrelated offense. On March 8, 2012, the trial court denied Burdette's motion for JNOV. Burdette appealed, asserting two assignments of error: (1) the trial court erred in not *sua sponte* barring Detective Williford's testimony in two instances that allegedly amounted to Confrontation Clause violations, see *infra*, and (2) the verdict was against the weight of the evidence. We choose to address the latter argument first.

---

[8]The defendant's brief contends in its recitation of facts that this rebuttal was improper, since there was no testimony on the compatibility of the bullets with the handgun offered by the defense. However, this objection was not made at trial, nor has any related assignment of error been raised on appeal.

**DISCUSSION**

**A. Weight of the Evidence**

¶15.   We note at the outset that Burdette does not attack the legal sufficiency of the evidence but only the weight of the evidence.  Burdette argues that "the opposing facts presented to the jury supported either self-defense or murder," but that they did not support a verdict of manslaughter.  To support this argument, Burdette makes the bald assertion that when the jury declined to find him guilty of murder, it found that Smith had pulled a pistol on him.  Burdette next restates his theory of the case, and notes that the evidence could not exclude the possibility that Smith had a weapon.  Finally, Burdette makes the unclear argument that "[t]he same witness relied upon by the State to support the theory of no gun [sic] is the same witness that testified to the presence of drugs.  Thus, that the gun was removed at the same time as the drugs is the only plausible explanation."[9]  Burdette contends that the jury verdict was against the weight of the evidence, and that the motion for JNOV[10] or a new trial should have been granted.

¶16.   A "motion for a new trial is addressed to the discretion of the trial court, and such motion should be considered with caution.  '[T]he power to grant a new trial should be

_____

[9]Burdette does not clarify which witness he is referring to; the record shows that no witness at trial testified that Smith did not pull a weapon but did have drugs in the car with him. Most likely, he refers to Robert Walker, Jr., the eyewitness to the shooting. Walker testified that Smith did not pull a weapon on Burdette, and he testified that he believed the purpose of the trip to Batesville was to purchase drugs or pills from Smith. However, he did not testify that Smith actually did or did not have drugs physically present with him in the car at the time of the shooting.

[10]But again, it must be emphasized that Burdette does not assert a "sufficiency-of-the-evidence" argument but only a "weight-of-the-evidence" argument.

9

invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Weatherspoon v. State*, 56 So. 3d 559, 564 (Miss. 2011). This Court must "weigh the evidence in the light most favorable to the verdict" and must therefore look at the evidence in the light most favorable to the State's theory of the case. *Id.* at 564 (citations omitted). This Court "will disturb the verdict only 'when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Ben v. State*, 95 So. 3d 1236, 1253 (Miss. 2012) (citing *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005)).

¶17. Although he now argues that the evidence supported murder but not manslaughter, at trial, Burdette himself put forth Jury Instructions D-2 and D-3 on the lesser offense of manslaughter. Instruction D-3, defining "heat of passion," actually was granted as Jury Instruction 16. Burdette withdrew Instruction D-2 and did not object to the State's presentation of the similar Instruction S-5, both defining manslaughter; Instruction S-5 was given to the jury as Jury Instruction 17. Finally, the Court granted the State's Instruction S-4A as Jury Instruction 18 on the form of the verdict, without any objection from Burdette. Thus, Burdette's claim on appeal that the evidence supported a finding of either self-defense or murder, but not of manslaughter, is belied both by the record and by his actions at trial.

¶18. In Mississippi, manslaughter is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. . . ." Miss. Code Ann. § 97-3-35 (Rev. 2006). This Court has held that "when the evidence would justify a conviction of murder, the defendant may not complain of a conviction of the lesser offense

10

of manslaughter, nor of an instruction covering such offense." ***State v. Shaw***, 880 So. 2d 296, 309 (Miss. 2004) (citing ***Huffman v. State***, 192 Miss. 375, 6 So. 2d 124, 125 (1942)). In ***Pruitt v. State***, 28 So. 3d 585 (Miss. 2010), a defendant was, as in the case at bar, convicted of manslaughter in the wake of a murder indictment, where his theory of defense was that he acted in necessary self-defense because he believed that the victim had threatened him with a gun. Other witnesses present did not see a gun, and after the shooting, it was determined that the victim actually did not have a gun. This Court held that "[r]elying on the absence of a gun or other evidence of deadly force, the jury reasonably could have determined that Pruitt did not act in necessary self-defense." ***Id.***, 28 So. 3d at 589.

¶19. In today's case, we find that the overwhelming weight of the evidence did not preponderate against a manslaughter or even a murder conviction. Although there was testimony that Smith possessed a gun, only Burdette saw him wield it before the shooting, and his testimony was contradicted by eyewitness Robert Walker, who testified to a killing with no immediate provocation. No gun was found in the car where Smith was shot, although there was testimony alleging that Cynthia Smalley or even Smith himself could perhaps have disposed of the gun before police arrived. Smith survived the shooting long enough to name Burdette as his shooter. Burdette admitted to several family members that he had killed someone but did not allege self-defense; for nearly two weeks after his arrest, he denied to police even being in Batesville at the time of the killing. Burdette testified that he was shaken and confused and therefore did not volunteer the information to his loved ones or to law enforcement that he had acted in self-defense.

¶20. All told, Burdette had a plausible tale of self-defense that the jury might have chosen to believe; but the jury did not. We find that the evidence did not preponderate in support of the self-defense claim, nor did it render the verdict an unconscionable injustice. Rather, the evidence presented a factual question for the jury to determine, beyond a reasonable doubt, whether Burdette acted in necessary self-defense. As noted above, where, as here, the evidence would justify a conviction of murder, the defendant may not complain of a conviction of the lesser offense of manslaughter.

¶21. In addition, evidence supported a manslaughter conviction as opposed to a murder conviction because of the significant testimony of recent bad blood and prior confrontation between Burdette and Smith. The evidence shows that Burdette used a dangerous weapon, to wit, a Sig Sauer nine-millimeter handgun. The jury could have found, based on the evidence before it, that Burdette had acted in the heat of passion, without malice but not in necessary self-defense, and therefore was guilty of manslaughter. The weight of the evidence supports the jury verdict, and this issue is therefore without merit.

**B. Confrontation Clause**

¶22. As noted above, Burdette contends that Detective Williford testified, without objection, to statements made by others, thereby violating his right to confront witnesses guaranteed by the Sixth Amendment of the U.S. Constitution and Article 3, Section 26 of the Mississippi Constitution. Williford testified he verified that the weapon used in the crime, a Sig Sauer nine-millimeter handgun, could fire .380 bullets via the following method: "We contacted the company that manufactured it and they definitely agreed with that and were in the process of sending us a letter and we never received the letter stating that it does

12

shoot both bullets."  As already noted, neither the "we" who contacted the company nor the "they" who verified the compatibility of .380 bullets was ever identified.  The record shows that no one from the company testified at trial.  In addition, Williford testified that personnel at the crime lab determined that all seven casings found and four of the bullets found definitely were fired from the gun in question, and the other bullets were consistent with having been fired by the gun in question but could not be definitively included nor excluded.  This testimony was used to enter the crime lab's report into evidence.  No individual involved with the testing of the bullets or with the crime lab testified at trial.

¶23.  Even though no objection was entered in either instance, Burdette raises an issue implicating a fundamental constitutional right and asks that we consider it as plain error.  *See Conners*, 92 So. 3d at 682  ("a Confrontation-Clause violation is a violation of a fundamental, substantive right").

> Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right.  For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* (internal quotations omitted).  Burdette, as the accused, had the right to be confronted with the witnesses against him. U.S. Const. amend. VI.; Miss. Const. art. 3 § 26.  The United States Supreme Court has stated:

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused – in other words, those who "bear testimony." 2 N. Webster, *An American Dictionary of the English Language* (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

13

*Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004). The purported statements of unidentified persons at the company constituted hearsay, and – since it is unclear who contacted the company – perhaps double hearsay and its admission resulted in a violation of the Confrontation Clause.

¶24.     The admission of the crime lab report also was error.  The United States Supreme Court has held:

> The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

*Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2532, 174 L. Ed. 2d 314 (2009).  Here, the surrogate testimony was presented by a police officer with no apparent relation to the Mississippi Crime Laboratory or to this particular report.  The report undoubtedly was testimonial; we have held in a similar case that a "ballistics report provided 'testimony' against [the defendant] by showing that the shotgun shells found at the scene were consistent with having been fired from the shotgun found at the scene." *Conners v. State*, 92 So. 3d 676, 684 (Miss. 2012).  The analysts were not found to be unavailable, and Burdette had no prior opportunity for cross-examination. The admission of the document without live testimony from an individual involved in the analysis constituted a violation of the Confrontation Clause.

14

¶25. However, that is not the end of this Court's inquiry. Having determined that a defendant's right of confrontation was violated, we do not recognize plain error unless "the error resulted in a manifest miscarriage of justice." *Conners*, 92 So. 3d at 684. In this case, there was no manifest miscarriage of justice, since the only testimony improperly introduced related to an issue agreed upon by the parties and uncontroverted by the evidence: the fact that Smith was killed with a Sig Sauer nine-millimeter handgun wielded by Burdette. Detective Williford's statement that an unknown person verified that a Sig Sauer nine-millimeter handgun can fire .380 caliber bullets was echoed by the introduction of the exact same testimony by Detective Barry Thompson, who testified from personal knowledge. While the report of the Mississippi Crime Laboratory was the only proof that the bullets collected at the scene were either fired by or consistent with having been fired by the gun in question, the parties at trial were in agreement that Burdette shot Smith at point-blank range with that weapon. The only disputed question was whether Burdette did so in necessary self-defense.

¶26. Burdette suggests for the first time on appeal that, while he did not "recall or testify that 'Old School' [Herman Smith] actually fired his weapon, that otherwise could be inferred from the numerous .380 shell casings recovered." Although there was testimony that Smith owned a .380 pistol, neither Burdette nor any other witness at trial ever contended or implied that Smith had fired a weapon during the incident. Burdette contended only that Smith had pointed the weapon at him. No evidence was before the jury to indicate that anyone other than Burdette had fired bullets at the scene. Burdette's sole theory in this case was that he fired in self-defense after Smith pointed, but did not fire, a pistol at him. Since all of the

15

properly admitted evidence – including statements by the victim himself prior to his death, and testimony by both the defendant and eyewitness Robert Walker – showed that the sole shooter was Derrick Burdette, the improperly admitted evidence that the bullets at the scene were fired by Burdette's Sig Sauer handgun did not harm or prejudice him. Because we find that the constitutional errors in this case did not prejudice the outcome of the trial, there was no manifest miscarriage of justice and no reversible error.

## CONCLUSION

¶27. We affirm the judgment of conviction and sentence entered by the Circuit Court for the Second Judicial District of Panola County.

¶28. **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. SENTENCE SHALL RUN CONSECUTIVELY WITH ALL OTHER SENTENCES. APPELLANT SHALL RECEIVE CREDIT FOR 133 DAYS PREVIOUSLY SERVED IN THIS CAUSE AND PAY COURT COSTS AND A FINE OF $6,000.00 TO THE CRIME VICTIM COMPENSATION FUND, WITH CONDITIONS.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., CHANDLER AND KING, JJ.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶29. I agree that Burdette's conviction must be affirmed, as he has not raised any issues warranting reversal. I write separately to ensure that my vote in no way implies any sort of approval of the improperly admitted evidence.

¶30. I agree with the majority that a plain-error review is appropriate, because the manner in which certain evidence was presented immediately calls to mind the accused's

16

constitutional right to confront the witnesses against him. U.S. Const. amend. VI; Miss. Const. art. 3 § 26. The officer's testimony and admission of the laboratory report should prompt us to question the constitutional implications of this evidence, especially in the context of the facts presented. Detective Williford testified that someone from the company that manufactured Burdette's handgun had said the pistol was capable of firing .380 ammunition, but the police were unable to obtain written confirmation from the manufacturer. In addition to this unverified hearsay, the crime laboratory report matching Burdette's nine-millimeter pistol to all of the shell casings and most of the bullets was admitted into evidence via Detective Williford, without any testimony from the person who had performed the testing. Notably, there was evidence that might cause a juror to question Williford's testimony, including testimony that Smith, the shooting victim, was known to carry a .380 calibre pistol and that Smith had threatened to kill Burdette. Burdette also claimed that he had shot Smith in self-defense, and seven .380 casings were found in and around his car. However, Burdette's gun was a Sig Sauer nine-millimeter pistol, and the evidence offered as proof that this weapon was capable of firing .380 ammunition is the very evidence claimed by Burdette to have violated the Confrontation Clause.

¶31. Despite the curious nature of this evidence, it would be a stretch to find plain error when, as here, it turned out to be consistent with the defendant's prior statements and his trial testimony. Burdette never said that Smith had fired a weapon, and Burdette never disputed that he had fired the nine-millimeter handgun recovered by law enforcement personnel and received into evidence at trial. The evidence now complained of on appeal did not conflict with Burdette's version of the facts. Therefore, we cannot say that the admission of this

17

evidence resulted in a "manifest miscarriage of justice," when, based on the record before us, there was no apparent contradiction between this evidence and Burdette's account of relevant events. *See, e.g.*, **Cox v. State**, 793 So. 2d 591, 599 (Miss. 2001) ("To constitute plain error, the trial court must have deviated from a legal rule, the error must be plain, clear or obvious, and the error must have prejudiced the outcome of the trial.") (citing **Grubb v. State**, 584 So. 2d 786, 789 (Miss. 1991); **Porter v. State**, 749 So. 2d 250, 260-61 (Miss. Ct. App.1999)).

¶32. Additionally, I have significant reservations regarding the testimony from another officer that, in his experience, the Sig Sauer nine-millimeter was capable of firing .380 calibre ammunition. Without any evidence that the officer's experience qualified him as an expert on this subject, his opinion testimony did not meet the legal requirements for admission. *See* M.R.E. 701 (opinion testimony by lay witness); M.R.E. 702 (testimony by experts). Whether a firearm with a rifled barrel that is of a particular calibre is capable of firing ammunition of a different calibre is a technical question that may have numerous subparts, including, but not necessarily limited to, whether the weapon merely is capable of firing such other-calibre ammunition *one* time, or whether it is capable of doing so *multiple* times, semi-automatically, without the necessity of reloading manually after each shot. It is the sort of question that, in a trial setting, usually would have been submitted to an expert, or to multiple experts, in advance of the trial, and subjected to appropriate scientific study by such expert(s) in accordance with established testing procedures. A different set of testing procedures likely would be required to ascertain whether it was possible for a *certain* firearm to have fired other-calibre ammunition. Forensic firearms examiners might also be called

18

upon to determine whether a certain firearm had fired ammunition of the *same* calibre, but of different brands or configurations or comprised of different components.

¶33. However, there was no objection to this opinion testimony. Therefore, like the laboratory report and the unverified statements of the pistol's manufacturer regarding the gun's firing capabilities, the admission of this evidence does not warrant reversal on appeal absent plain error. Given that there was no apparent conflict between this evidence offered by the State and the defendant's self-defense claim, it cannot be said that there was an obvious, prejudicial effect on the jury's verdict. *See, e.g., McGee*, 953 So. 2d at 215 (explaining that plain error requires reversal if "the error results in a manifest miscarriage of justice") (citing *Williams v. State*, 794 So. 2d 181, 187-88 (Miss. 2001), *overruled on other grounds*, *Brown v. State*, 995 So. 2d 698, 708 (Miss. 2008)). It is not difficult to imagine that, under a different set of facts, this evidence might very well require reversal.

**DICKINSON, P.J., CHANDLER AND KING, JJ., JOIN THIS OPINION.**