# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-KA-00166-SCT

*RICHARD W. MORROW a/k/a RICHARD*
*MORROW a/k/a RICHARD WARRINER MORROW*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/2016 |
| TRIAL JUDGE: | HON. JAMES LAMAR ROBERTS, JR. |
| TRIAL COURT ATTORNEYS: | KIMI D. KITCHENS |
| | JOSHUA S. WISE |
| | ROBERT S. LAHER |
| | JOHN O. WINDSOR |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | JOHN WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/13/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Richard Morrow was convicted of fondling and sentenced as a habitual offender to life in prison without parole.  Morrow's trial counsel did not file a direct appeal.  Nevertheless, the trial court allowed Morrow to proceed with an out of time appeal.  Morrow raises four assignments of error: (1) whether the trial court erred in allowing testimony and

comments about DNA evidence; (2) whether the victim's nonverbal responses were ambiguous and therefore insufficient to support the verdict; (3) whether he received ineffective assistance of counsel; and (4) whether cumulative error requires reversal. Discerning no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     In July 2012, Morrow lived with his sister Carlie[1] in Corinth, Mississippi.  Carlie's daughter Laura and her grandson Ben had lived with Carlie before Morrow moved in.  Laura and Ben moved out and lived with various friends and Laura's aunt, who lived a few houses down the street from Carlie.  Laura kept some of her clothes at Carlie's home. Laura and Ben visited often.

¶3.     On July 26, 2012, when Ben was three years old, Laura and Ben went to Carlie's house so that Laura could gather some clothes, and Morrow was there.  Carlie was not present when they arrived, but Laura and Ben waited for her to return because she had agreed to babysit Ben while Laura went to work.

¶4.     While Ben was in the living room watching television, Laura was in her old room watching television and gathering clothes.  Ben was wearing only his underwear.  Laura exited her old room to get something to drink.  She passed through the living room, and she noticed that Ben was not there.  She went into the kitchen.  When Laura walked into the kitchen, she saw Ben standing on the table facing Morrow.  Laura saw Morrow pulling up

---

[1] The names of the minor victim and his family members have been changed to protect the identity of the minor victim.

Ben's underwear quickly, and she heard Ben's underwear pop against his waist. Laura pretended as if nothing was wrong, and Morrow began yelling at Ben to get off the table.

¶5.  Ben told Laura that he needed to use the bathroom, so she took him into the bathroom. In the bathroom, Laura asked Ben what he was doing on the table, and he responded that he did not want to tell her because he was scared. Laura reassured Ben that he was not in trouble, and he told her that "Uncle Ricky[2] had sucked his peepee."[3] Laura then examined Ben's penis and saw that it was wet with saliva. Ben did not urinate while they were in the bathroom, and Laura was sure that the moisture was not urine.

¶6.  Laura gathered their personal items; she dressed Ben, and they left to go to Laura's aunt's house. Laura called Carlie crying. Laura told Carlie something bad had happened and asked her to come get them. Carlie was near the house and picked up Laura and Ben. Carlie asked Ben what had happened, but he told her that he was scared and did not want to tell her. Carlie reassured him, and Ben told her the same thing that he had told Laura. Laura and Carlie went to Laura's aunt's house and called law enforcement to report the incident. They went to the Alcorn County Sheriff's Department where Laura provided a statement. Ben was taken to the hospital, and medical personnel swabbed his penis.

¶7.  Ben, who was seven years old at the time of the trial, testified after Laura. Ben testified that Morrow put his mouth on his "middle spot," which he explained was what he uses to go to the bathroom. Ben's account of the incident corroborated Laura's testimony.

---

[2]  Ben called Morrow "Uncle Ricky."

[3]  Ben referred to his penis as his "peepee."

3

¶8. Reggie Anderson, a former criminal investigator with the Alcorn County Sheriff's Department, testified that he took Laura's statement regarding an alleged fondling. Anderson sent Ben to the hospital for a sexual assault examination kit to be performed. Anderson sent the sexual assault kit to the Mississippi Crime Laboratory. Anderson obtained permission from Morrow to take a DNA swab from him. Anderson provided a DNA sample from Morrow to the crime lab, but the crime lab misplaced the sample. Anderson obtained permission again from Morrow to take another DNA sample from him. Anderson submitted the second sample to the crime lab.

¶9. Anderson testified about the DNA results he had received from the crime lab:

Q: What were the results?

A: It came back as a male contributor on the penile swab of [Ben].

Q: Was that a male contributor to the evidence found on the penis of [Ben]?

A: Correct.

¶10. On cross-examination, Anderson testified that the report he received did not identify Morrow as the male contributor. On redirect, the prosecution again questioned Anderson about the crime lab results:

Q: Did you state to the jury the results from the crime lab was a male contributor?

A: Yes, sir.

Q: Were there any other males accused in your investigation of the fondling of [Ben]?

A: No, sir.

4

Q: From the beginning of when this was reported to you on July 26 of 2012, was there one suspect?

A: Yes, sir.

Q: Was there one male accused?

A: Yes, sir.

Q: Under oath, tell the jury who that person is.

A: Richard Morrow.

¶11. Anderson also testified about the statement Morrow had given. Morrow stated that he and Ben were in the kitchen playing with his false teeth, with Morrow removing them and putting them back in his mouth to entertain Ben. Ben asked to see the false teeth, took them, and put the false teeth in his underwear.

¶12. Morrow testified in his defense. Morrow's testimony tracked his statement, and he denied fondling Ben. Morrow testified that on the morning of July 26, 2012, Ben was in his underwear. Morrow testified that he had just eaten and was cleaning his dentures when Ben became curious. Morrow testified that he then put his teeth in and pulled them out several times to entertain Ben. Morrow testified that Ben then grabbed them and put them down his underwear. Morrow grabbed Ben's arm and took the dentures back. Morrow testified that he was washing his dentures and his hands while Ben climbed on the table to show Morrow his stomach. Morrow testified that he removed Ben from the table so he would not fall and continued drying his hands with a dish towel. Morrow testified that Laura walked in while he was drying his hands. Morrow testified that he freely gave DNA samples because he knew he did not touch Ben.

5

¶13. The jury found Morrow guilty of fondling. The trial court sentenced Morrow as a habitual offender to life in prison without the possibility of parole. Morrow's attorneys did not file any post trial motions and did not appeal his conviction. Morrow requested that the circuit court allow him to file an out of time appeal. The trial court granted Morrow's request, allowed his trial counsel to withdraw, and appointed the Office of Indigent Appeals as appellate counsel for Morrow.

¶14. Morrow appeals, arguing that 1) the hearsay testimony about the DNA results was improperly admitted and violated his Sixth Amendment right to confront witnesses against him, 2) Ben's nonverbal responses were ambiguous and thus insufficient to support the verdict, 3) his trial counsel rendered ineffective assistance of counsel, and 4) the cumulative effect of the errors raised requires reversal.

<u>**STANDARD OF REVIEW**</u>

¶15. Morrow asks the Court to review the issues he raises on appeal for plain error because he did not raise the issues at trial. Under the plain error doctrine, the Court may recognize obvious error that was not raised at trial and that affects a fundamental, substantive right. *Conners v. State*, 92 So. 3d 676, 682 (¶ 15) (Miss. 2012). Moreover, the error must have "resulted in a manifest miscarriage of justice or 'seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings.'" *Id.* (quoting *Brown v. State*, 995 So. 2d 698, 703 (¶ 21) (Miss. 2008)).

**DISCUSSION**

I. **Whether the admission of testimony regarding the DNA results violated Morrow's constitutional rights to confront witnesses against him.**

¶16. Morrow argues that the admission of testimony and comments on DNA results violated his constitutional rights to confront witnesses against him. We agree that allowing testimony relaying the results of the DNA test at issue violated Morrow's rights to confront the witnesses against him; however, the error falls short of plain error.

¶17. In *Burdette v. State*, a Panola County jury acquitted the defendant of murder but convicted him of manslaughter. *Burdette v. State*, 110 So. 3d 296, 297 (¶ 1) (Miss. 2013). Burdette shot the victim. *Id.* at 297-98 (¶ 2). The *Burdette* Court held that two separate Confrontation Clause violations had occurred at trial. First, a detective testified that he had verified that the weapon used to commit the crime, a Sig Sauer handgun, could fire .380 bullets by asking someone at Sig Sauer whether it could. *Id.* at 303 (¶ 22). The *Burdette* Court wrote, "The purported statements of unidentified persons at the company constituted hearsay, and—since it is unclear who contacted the company—perhaps double hearsay and its admission resulted in a violation of the Confrontation Clause." *Id.* at 303 (¶ 23). Second, and apropos of the testimony describing the DNA results in the case *sub judice*, in *Burdette* the same detective testified regarding results of ballistics testing conducted by the crime lab. *Id.* at 303 (¶ 22). No person from the crime lab testified. *Id.* The *Burdette* Court wrote,

> Here, the surrogate testimony was presented by a police officer with no apparent relation to the Mississippi Crime Laboratory or to this particular report. The report undoubtedly was testimonial; we have held in a similar case that a "ballistics report provided 'testimony' against [the defendant] by showing that the shotgun shells found at the scene were consistent with having been fired from the shotgun found at the scene." *Conners v. State*, 92 So. 3d 676, 684 (Miss. 2012). The analysts were not found to be unavailable, and Burdette had no prior opportunity for cross-examination. The admission of the

document without live testimony from an individual involved in the analysis constituted a violation of the Confrontation Clause.

*Burdette*, 110 So. 3d at 304 (¶ 24) (alteration in original). Like the above-described testimony from the detective in *Burdette*, Anderson's testimony regarding the DNA results in the case *sub judice* violated the Confrontation Clause. However, the record does not demonstrate that the error amounted to plain error. In *Burdette*, the Court held that the error did not result in a "manifest miscarriage of justice," because the evidence admitted in violation of the Confrontation Clause related to uncontested matters upon which the parties agreed. *Burdette*, 110 So. 3d at 304 (¶ 25) (quoting *Conners v. State*, 92 So. 3d 676, 684 (¶ 20) (Miss. 2012)). In the case *sub judice*, Morrow testified that his victim placed Morrow's dentures in his underwear; Morrow's testimony jibed with the State's evidence that his DNA was found on the victim's penis.

¶18. Moreover, the record in the instant case is devoid of any attempt by Morrow to discredit or even question the results of the DNA test other than to clarify, on cross-examination of Anderson, that the report did not identify Morrow as the contributor of the genetic material but, rather, indicated only that the material came from a male. His trial counsel did not attempt to cross-examine Anderson or any other witness in an attempt to contest the accuracy of the reported results. No questions were attempted that could not be answered by the witnesses available. In other words, nothing in the record indicates to the Court that Morrow's case would have been affected one iota by the presence of someone from the crime lab who performed the DNA testing.

8

¶19. We are not free to guess what might have happened in the absence of facts found in the record. Rather, we may only act on the record before us. *Oakwood Homes Corp. v. Randall*, 824 So. 2d 1292, 1293 (¶ 4) (Miss. 2002) (citing *Branch v. State*, 347 So. 2d 957, 958–59 (Miss. 1977)). "Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them." *Randall*, 824 So. 2d at 1294 (¶ 4) (quoting *Mason v. State*, 440 So. 2d 318, 319 (Miss. 1983)). In the absence of indications from the record that Morrow's trial strategy was frustrated or harmed by the absence of the witness who prepared the report, no plain error occurred. *Walters v. State*, 206 So. 3d 524, 530 (¶ 16) (Miss. 2016) (In order for plain error to be found, the error in question must be "plain, clear, or obvious" and "prejudice[] the outcome of the trial." (quoting *McGee v. State*, 953 So. 2d 211, 215 (¶ 8) (Miss. 2007))). There can be no plain error, reversible violation of the Confrontation Clause when the record contains no effort by the defendant to confront the statement in question.

¶20. Like *Burdette*, the Confrontation Clause violation did not result in a manifest miscarriage of justice; therefore, no plain error exists.

II.   **Whether the victim's nonverbal responses were ambiguous and thus insufficient to support the verdict.**

¶21. Morrow argues that the nonverbal responses of the victim were ambiguous and therefore insufficient to support the verdict. In support, Morrow relies on *Jenkins v. State*, in which the Mississippi Court of Appeals wrote that it was "concerned with the ambiguity of [the victim]'s non-verbal response—'(Moving head)'—to the question of whether [the

9

defendant] had inserted his finger into her vagina." *Jenkins v. State*, 101 So. 3d 161, 168 (¶ 20) (Miss. 2012).

¶22.    Unlike the transcript in *Jenkins*, the transcript here indicates whether Ben's nonverbal responses were affirmative or negative. Even so, "[a]s always, the jury has the prerogative to accept or reject, in whole or part, the testimony of any witness, expert or lay." *Smith v. State*, 925 So. 2d 825, 839 (¶ 33) (Miss. 2006) (holding that the jury may draw its own conclusions from the verbal statements and nonverbal reactions of the witness on the stand). Here, the jury had the prerogative to accept or reject, in whole or part, Ben's testimony. Furthermore, Ben's nonverbal responses certainly did not result in a manifest miscarriage of justice or seriously affect the fairness, integrity, or public reputation of judicial proceedings, because the jury was free to accept Laura's testimony, which mirrored Ben's testimony.[4]

### III.    Whether Morrow received ineffective assistance of counsel.

¶23.    Morrow argues that he received constitutionally ineffective assistance of counsel because his trial counsel failed to (1) make objections and (2) perfect and file Morrow's appeal.

¶24.    "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Archer v. State*, 986 So. 2d 951, 955 (¶ 15) (Miss.

---

[4]    Morrow makes an offhanded remark within the present assignment of error concerning Ben's competency to testify. "[I]n the absence of meaningful argument and citation of authority th[e] Court will generally not consider the assignment of error." *Goff v. State*, 14 So. 3d 625, 666 (¶ 181) (Miss. 2009) (citing *Randolph v. State*, 852 So. 2d 547, 558 (¶ 30) (Miss. 2002)). Notwithstanding Morrow's failure to advance a meaningful argument, we discern no plain error surrounding the trial court's finding that Ben was competent to testify.

2008). The Court "may, however, address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record." ***Dartez v. State***, 177 So. 3d 420, 423 (Miss. 2015) (citing M.R.A.P. 22). "In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial." ***Holly v. State***, 716 So. 2d 979, 989 (¶ 37) (Miss. 1998) (citing ***Strickland v. Washington***, 466 U.S. 668, 687-96 (1984)). The Court considers "the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudical." ***Dartez***, 177 So. 3d at 423 (¶ 19) (citing ***Strickland***, 466 U.S. at 687-96). A strong but rebuttable presumption exists that counsel's conduct falls within the wide range of reasonable assistance. ***Dartez***, 177 So. 3d at 423 (¶ 19). The Court will find that counsel's performance was deficient only when a reasonable probability exists that, but for the attorney's errors, the outcome would have been different. ***Id.***

### 1. *Failure to object*

¶25. The Court has held that "[t]he failure of counsel to make certain objections may fall within the ambit of trial strategy,[5] and therefore may not give rise to a claim for ineffective assistance of counsel." ***Conners***, 92 So. 3d at 686 (¶ 25) (quoting ***Nix v. State***, 8 So. 3d 141, 144 (¶ 13) (Miss. 2009)).

---

[5] Morrow makes a suggestion in a footnote, without citing any authority, that his trial counsel had "missed [an] opportunit[y]" to make an opening statement. Morrow's claim is without merit because the "[t]he decision to make an opening statement is a 'strategic one.'" ***Burns v. State***, 813 So. 2d 668, 677 (¶ 29) (Miss. 2001) (quoting ***Manning v. State***, 735 So. 2d 323, 347 (¶ 56) (Miss. 1999)).

11

¶26.    As explained above, the Confrontation Clause violation did not result in plain error. We also find it conceivable that Morrow's trial counsel welcomed the DNA evidence as part of his trial strategy.   Morrow's trial counsel argued during closing that Morrow had consented to a DNA test on two occasions—"[n]ot something [Morrow's trial counsel] would believe a guilty man would do."

¶27.    Moreover, Morrow's trial counsel used the DNA test results as part of his argument that the results had merely shown a male contributor.   Indeed, Morrow's trial counsel established on Anderson's cross-examination that while the DNA results were positive for a male contributor, the results did not show that Morrow was the contributor.   Finally, Morrow fails to demonstrate prejudice resulting from the failure to object to the testimony about the DNA results.   Laura's, Ben's, and Anderson's testimony supported the fondling conviction apart from the DNA results.

¶28.    As previously discussed, Ben's nonverbal responses on the witness stand did not result in plain error.   For similar reasons, we hold that Morrow's claim that he received ineffective assistance of counsel due to the failure to object to the nonverbal responses fails for lack of prejudice.   Even assuming the failure to object or seek to have the trial court instruct the victim to verbally answer constituted deficient performance,   Morrow fails to show that the outcome would have been any different had his trial counsel raised the issue at trial.[6]

---

[6] Morrow also includes a bare claim within the body of his argument that he received ineffective assistance of counsel because his trial counsel did not object to the State's questions about his prior fondling conviction.  First, Morrow's trial counsel opposed the introduction of the conviction. Second, the decision to not object might very well have been for strategic reasons, *i.e.*, choosing not to draw further attention to the prior fondling conviction.

### *2. Failure to perfect and file an appeal*

¶29. Morrow does not point to any resulting prejudice from his trial counsel's failure to perfect and file an appeal. Certainly, no prejudice exists, because Morrow was allowed to file an out of time appeal and to have new appellate counsel appointed.

¶30. We likewise reject Morrow's suggestion that he received ineffective assistance because his trial counsel did not file any post trial motions. Put simply, Morrow does not explain what post trial motion might have been successful had it been filed. While the Court has held that failure to file a post trial motion may constitute deficient performance, Morrow fails to demonstrate the prejudice resulting from the failure to file a post trial motion. *See Pace v. State*, 242 So. 3d 107, 118 (¶ 31) (Miss. 2018) (holding that the defendant had not shown any prejudice resulting from the failure to file post trial motions because no reasonable probability existed that the motions would have been granted).

## IV. Whether cumulative error requires reversal.

¶31. Morrow argues that the cumulative effect of multiple errors requires reversal under the cumulative error doctrine. While harmless error alone is not reversible, when more than one harmless error occurs at the trial level, the errors might have the cumulative effect of depriving a defendant of a fair trial. *Wilson v. State*, 21 So. 3d 572, 591 (¶ 58) (Miss. 2009). Because no cumulative harmless errors require reversal, the cumulative error doctrine is inapplicable.

### <u>CONCLUSION</u>

13

¶32.  While Morrow's right of confrontation was violated, the error did not amount to plain error.  Morrow's remaining arguments are without merit.  Accordingly, we affirm the circuit court's judgment.

¶33.  **AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶34.  Because the violation of Morrow's constitutional right to confront witnesses against him amounts to plain error, and because insufficient information is in the record before this Court to determine whether ineffective assistance of counsel occurred, I respectfully dissent.

*1.    Confrontation Clause*

¶35.  This Court has established that a Confrontation Clause violation is a violation of a fundamental, substantive right under plain error review. *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012).  Both the United States Constitution and the Mississippi Constitution guarantee the right of a criminal defendant to confront and cross-examine witnesses against him.  U.S. Const. amend. VI; Miss. Const. art. 3, § 26.  The United States Supreme Court determined that testimonial statements made by a witness who does not appear at trial are inadmissible under the Confrontation Clause, unless the witness is unavailable and the defendant had an opportunity to cross-examine that witness.  *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).  Documents that are created solely for evidentiary purposes are "testimonial"; therefore, "[f]orensic laboratory reports created specifically to

14

serve as evidence against the accused at trial are among the 'core class of testimonial statements' governed by the Confrontation Clause." *Jenkins v. State*, 102 So. 3d 1063, 1066 (Miss. 2012) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)).

¶36.    In this case, the forensic laboratory report was created specifically to serve as evidence against Morrow.  Therefore, the analyst who performed the testing, or another forensic expert with sufficient involvement with the testing and/or report, must testify regarding the report to satisfy the Confrontation Clause.  *Armstead v. State*, 196 So. 3d 913, 919-21 (Miss. 2016). While the report itself was not entered into evidence in this case, this Court has examined testimony about a report and testing results under the Confrontation Clause in much the same manner as if the report itself had been admitted.  *Id.* at 920; *Hingle v. State*, 153 So. 3d 659 (Miss. 2014); *see also* *England v. State*, 195 So. 3d 830 (Miss. Ct. App. 2016).

¶37.    The majority agrees that the State offering the DNA results via surrogate testimony of a former sheriff's department investigator with no apparent relation to the Mississippi Crime Laboratory or to the DNA report produced violated Morrow's right to confront witnesses against him.  Crucial to the error is that this testimony was offered not on a tangential issue, but as evidence to prove the central issue in the fondling case: whether Morrow placed his mouth on Ben's penis.

¶38.    Finding an obvious error that affects a fundamental, substantive right in the Confrontation Clause violation, this Court must determine whether such error resulted in a manifest miscarriage of justice, or seriously affected the fairness, integrity, or public

15

reputation of judicial proceedings. In this case, the testimony about the DNA results went to the central element of the criminal charge. The DNA results were not cumulative of other evidence—the only other direct evidence regarding the issue consisted of the statements of the child victim.[7] DNA evidence is often powerful evidence. And making the Confrontation Clause violation more unjust is the fact that Morrow's DNA was sent to the crime lab for comparison to the DNA from Ben's sexual assault kit and a match was not found. Morrow was deprived of the opportunity to cross-examine a DNA analyst as to why a match was not found and how that affects the probability that the DNA found on Ben was Morrow's. Instead, the State was able to emphasize the DNA results without any explication of those results or lack thereof.[8] The majority, however, chastises Morrow for failing to cross-examine the former officer, who had no knowledge of the process of analyzing DNA or the meaning behind the DNA results, regarding the DNA results. Morrow's failure to emphasize the constitutional violation should not be held against him. Indeed, while holding that the admission of the evidence violated Morrow's right to confront the witnesses against him because a witness with proper knowledge was not present for Morrow to confront in the first

---

[7]The mother's testimony regarding the issue was limited to what Ben told her; she did not directly witness Morrow placing his mouth on Ben's penis.

[8]For example, in its closing argument, the State argued,

> Then there was a sexual assault kit done. The results were that it came from a male contributor. No, it didn't say Richard Morrow. It said it came from a male contributor. That is what we got. That is what they sent to us. It came from a male contributor. How many more people do we think sucked this child's penis that day? There's only one person that's been said that did that. There's only one person that that saliva could have come from. There's only one male.

16

place, the majority then paradoxically concludes that "[t]here can be no plain error, reversible violation of the Confrontation Clause when the record contains no effort to confront the statement in question." Maj. Op. ¶ 19. In other words, the majority finds a Confrontation Clause violation. A Confrontation Clause violation means that a statement was admitted into evidence that was constitutionally impossible for the defendant to confront. The majority now requires that the defendant confront the impossible-to-confront statement before deeming the Confrontation Clause violation reversible. Such a dangerous holding requiring a defendant to confront a statement that is impossible to confront could effectively eliminate the right to confront witnesses in Mississippi. Thus, the admission of powerful DNA evidence on the ultimate issue through a surrogate witness with no connection to the DNA analysis or report created a manifest injustice, especially given the holes in that evidence that Morrow was unable to explore. Accordingly, this Court should reverse Morrow's conviction and remand the case for a new trial.

## 2. *Ineffective Assistance of Counsel*

¶39. I agree with the majority that Morrow cannot show prejudice for the failure to perfect and file an appeal, given that Morrow's motions for an out of time appeal were granted, new counsel was appointed on appeal, and this Court is hearing his appeal. As to Morrow's claims that his counsel rendered ineffective assistance for the failure to object to the admission of the DNA test, this Court cannot determine on this record whether the outcome of the trial would have changed had trial counsel lodged the objections mentioned. Thus, insufficient information exists in the trial record for this Court to adequately address an

17

ineffective assistance of counsel claim; therefore, this Court should deny relief while preserving Morrow's right to make this argument through a petition for post-conviction relief. *See **Hawkins v. State***, 255 So. 3d 1264, 1270 (Miss. 2018). It is inappropriate for the majority to adjudicate this claim on direct appeal. Indeed, the majority admits that this issue requires facts not in the record: the majority claims that the record is absent of any indication of Morrow's trial strategy. Maj. Op. ¶ 19. Yet, the majority then employs conjecture to conclude that it is "*conceivable* that Morrow's trial counsel welcomed the DNA evidence as part of his trial strategy." Maj. Op. ¶ 26 (emphasis added). This issue should be preserved for a petition for post-conviction relief.

¶40. Thus, because the Confrontation Clause violation resulted in manifest injustice, and because a portion of Morrow's ineffective assistance of counsel claim requires that Morrow prove facts outside the record, I believe that the Court should reverse Morrow's conviction and remand the case for a new trial and should decline to address Morrow's ineffective assistance of counsel claim regarding the failure to object.

**KITCHENS, P.J., JOINS THIS OPINION.**