# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00799-COA

**KENNY ARMISTAD A/K/A KENNY R.**　　　　　　　　　**APPELLANT**
**ARMISTAD A/K/A KENNY RIHEAM**
**ARMISTAD A/K/A KENNY WAYNE ARMISTAD**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/2023 |
| TRIAL JUDGE: | HON. LEE JACKSON HOWARD V |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/26/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Following a five-day trial, a Lowndes County Circuit Court jury convicted Kenny Armistad of one count of first-degree murder, two counts of aggravated assault, and one count of possession of a weapon by a felon. The trial court sentenced Armistad to serve consecutive sentences of life imprisonment on Count I, twenty years on Count II, twenty years on Count III, and ten years on Count IV. Armistad's post-trial motion for judgment notwithstanding the verdict or, alternatively, a new trial was denied. Armistad appeals, asserting that (1) his convictions are not supported by sufficient evidence; (2) the trial court

erred by failing to grant a mistrial or declaring a mistrial sua sponte; (3) his trial was prejudiced by improper closing arguments; and (4) the trial court erred by refusing to instruct the jury on the definition of self-defense. For the reasons addressed below, we affirm Armistad's convictions and sentences.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS[1]

¶2. A Lowndes County grand jury returned a four-count indictment against Armistad for first-degree murder of Frank Edwards (Count I); aggravated assault of Raekwon Sherrod by shooting and causing injury (Count II); aggravated assault of Elijah Sherrod by shooting and attempting to cause injury (Count III); and possession of a firearm by a felon (Count IV). A jury trial was held from February 27, 2023, to March 3, 2023. The jury convicted Armistad of all four counts, and the trial court sentenced Armistad as set forth above.

### I. The State's Case

### A. The Shooting and Physical Evidence from the Crime Scene

¶3. Officer Lexus Ware of the Columbus Police Department testified that he responded to a dispatch received about 9:00 p.m. on December 30, 2020, reporting shots fired at an address in Columbus, Mississippi.[2] When he arrived at the residence, Officer Ware found Frank Edwards lying face down in the driveway, not breathing. Another man (Raekwon Sherrod) was complaining of gunshots to the back of both his legs.

¶4. Raekwon told Officer Ware that "three males got out of the vehicle and one of them

---

[1] Additional matters occurring during trial are addressed later.

[2] Later in his testimony, Officer Ware confirmed the address was 1315 12th Avenue South in Columbus, Lowndes County, Mississippi.

2

started peeing and one of them stated, what you putting down, and they started shooting." Officer Ware also spoke with Raekwon's brother, Elijah Sherrod, who was at the crime scene and "pretty much gave the same thing [(information)]" as Raekwon. Officer Ware added that Elijah told him that he shot back in self-defense and gave the gun he used to another officer, Investigator Darnell Madison. Officer Ware and other officers, including Officer Bentley Holcombe, searched for evidence and found multiple shell casings; Officer Ware marked the casings with evidence markers, but he did not collect them. Officers Ware and Holcombe were wearing body cameras, and the body-camera footage from each camera was admitted at trial. Both Officer Ware and Officer Holcombe testified that neither Raekwon nor Elijah could identify or describe the car that drove up other than it was a darker color. Raekwon and Elijah also could not identify any of the men who got out of the car, including the shooter.

¶5. Investigator Madison testified that he arrived at the scene and spoke with Elijah, who "pretty much told me that a car pulled up, him and his brother and his friend was standing there in the backyard, a car pulled up and they started shooting at each other." Elijah told Investigator Madison that he was standing by his car close to the house when he "shot back" with his .380-caliber handgun. He gave Investigator Madison his handgun.

¶6. Raekwon testified that he had agreed to give Edwards a ride to see his girlfriend on the night of the shooting. Before they went to Edwards's girlfriend's house, they stopped at his brother Elijah's house around 8 p.m. Raekwon drove a gray Nissan Altima to Elijah's house and parked it in the driveway behind four other cars. Raekwon introduced Edwards

3

to Elijah, and they stood around in the driveway near the Altima drinking and talking.

¶7.	As the three men stood in the driveway, a "dark-colored gray Mazda" pulled into the driveway behind Raekwon's Altima around 8:30 p.m. Neither Raekwon nor Elijah knew whose car it was, and they were not expecting anyone else. They said that the driver got out of the car, but they could not see him clearly because it was dark. The driver spoke briefly and then walked to some shrubs to "use the bathroom."

¶8.	As the driver walked to the shrubs, the passengers got out of the car. Neither Raekwon nor Elijah knew the men or could tell who they were. Both brothers noticed that one of the men on the passenger's side of the car was wearing a white t-shirt. Raekwon thought Edwards might know the man because he said, "That you, Bino?" Elijah did not hear what Edwards said, but he testified that Edwards spoke to the man. Raekwon was certain that Edwards said "Bino."

¶9.	Raekwon and Elijah both testified that almost immediately after Edwards spoke, they heard gunshots and saw fire coming from the barrel of a weapon being held by the man in the white t-shirt. Raekwon said it was a "big gun," and Elijah testified that "it was a long . . . muzzle flash." Raekwon ran for cover and later realized he had been shot on the backs of both legs and arms.

¶10.	Elijah testified that "once the first couple of shots let out, I seen [Edwards] hit the ground and that's when I returned fire." Elijah had a handgun that he always carried "for protection." Elijah testified that Edwards was facing the men in the gray car when the shots were fired. He "[saw] [Edwards] hit the ground]" but also said, "I don't know which way

4

he actually turned." He testified that he did not fire until he saw "[Edwards] hit the ground." During cross-examination, Elijah admitted that when he gave a statement to Sergeant Eric Lewis, he said, "I just hope I didn't hit him [(Edwards)]." During redirect examination, Elijah clarified that at the time he spoke to Sergeant Lewis, he only knew that Edwards had been shot. Later he learned Edwards was shot in the chest and the back. Elijah said Edwards was facing the person who shot him, and from where Elijah was standing, he could not have shot Edwards in the back.

¶11.    During his testimony, Elijah also explained that two types of ammunition casings were found in the area where he was standing when he shot his handgun because he had different bullets in his gun, which could shoot both .380-caliber and 9-millimeter bullets. Elijah believed he fired three times, but he really was not sure how many shots he fired. He then ran into his house and grabbed his phone to call 911. When Elijah got back outside, the gray Mazda was gone, and Edwards was motionless on the ground. Elijah ran to search for his brother. After finding Raekwon at the neighbor's home, he called 911.

¶12.    Shanna Cunningham of the Columbus Forensics Laboratory testified as an expert in the field of crime scene processing. She photographed the scene, including photographs of the driveway lined with trees to the left, several cars in the driveway, evidence markers for shell casings on the driveway, and Edwards's body lying in the driveway beside the gray Altima. Additionally, Cunningham processed several vehicles as part of her investigation, including a Mazda 6. She swabbed the vehicle's exterior and interior for touch DNA and collected other evidence from the vehicle's interior. Cunningham was unaware of any DNA

5

test results from the samples she collected.

¶13.    Cunningham testified that she found a projectile and three shell casings in the area where Edwards, Raekwon, and Elijah had been standing.  Two of the casings were marked "Hornady .380 Auto," and the third was an S&B 9-millimeter casing.  Melissa DeBerry of the Mississippi Forensics Laboratory testified as an expert in the field of firearms examination.  DeBerry matched these casings to Elijah's Walther PK .380 handgun.

¶14.    Cunningham also recovered seven "LC-14" casings, an "LC-10" casing, and an FC-223-REM casing in the area where Raekwon and Elijah said the shots had been fired.  DeBerry received these casings for examination, as well as a "Spikes Tactical model ST-15 multi-caliber rifle, serial number 000392."  This rifle was the one found near Ethelsville Baptist Church in Alabama, which is discussed in further detail below.  DeBerry matched the nine casings to this rifle.

¶15.    Additionally, Cunningham found five Smith &Wesson .40-caliber Wolf casings near the same grassy area where the men who arrived in the gray Mazda had been standing.  The Smith &Wesson casings appeared to have red paint on them.  DeBerry testified that she could not match the .40-caliber Wolf casings to any known firearm.

¶16.    Cunningham also described the photographs from the crime scene.  She testified that Edwards's body was near the parked Altima, and he had been shot several times.  Based on the location of the recovered casings, Cunningham believed that Edwards had been in the middle of the shootings.

**B.      The High-Speed Chase and Physical Evidence Retrieved from the Route**

¶17. Officer Johnny Max Branch of the Pickens County, Alabama Sheriff's Department testified that at approximately 10:00 p.m. that night, he and his partner, Officer Jody Elmore, were in their patrol car near mile marker three on Highway 82, three miles into Alabama from Lowndes County, Mississippi. A maroon Dodge Challenger approached at a high rate of speed. Officer Branch began to follow it to see how fast the car was traveling. As he approached, the Challenger made an "erratic lane change" to turn back on Highway 82 Westbound without signaling. Officer Branch turned on his lights and sirens to make a traffic stop. The driver, later identified as Armistad, did not stop. A high-speed chase ensued, with Armistad reaching speeds over 100 miles per hour and changing lanes and directions erratically. At mile marker 7, Officer Dana Elmore joined the pursuit.[3]

¶18. Officers Branch and Jody Elmore saw Armistad throw something out the window of his car near County Road 75. Officer Branch radioed Officer Dana Elmore to retrieve it. The item recovered at this location was a "white UPass box [and a] .40-caliber bullet Smith and Wesson with a … reddish tint on the back of it or the primer area." Further up County Road 75, Officer Branch saw another item thrown from the Challenger. In that location, police found a red cell phone just off the road.

¶19. At one point, Officers Branch and Jody Elmore lost sight of Armistad as he ran a stop sign and topped a hill near Ethelsville Baptist Church. They caught back up to Armistad past the church, and the chase continued. A little farther down the road, Officers Branch and Jody Elmore saw another item thrown from the passenger's side of the Challenger. They thought

---

[3] Officer Branch, as well as Officers Jody and Dana Elmore, testified about the chase, recovery of evidence, and the arrest. Officers Jody and Dana Elmore were married.

7

it might be a handgun. They later used a "bomb dog" to sniff in the area where Officer Branch thought Armistad had thrown a gun. The dog alerted officers to a pistol magazine.

¶20. Officer Branch was eventually able to pass Armistad, and he and Officer Dana Elmore forced him to stop. When Officer Branch approached the vehicle, Armistad would not show his hands, so the officers forced him out. Armistad was wearing blue jeans and a white t-shirt. He was alone. Officer Branch testified that Armistad told him that he was just trying to get back home to either Tuscaloosa or Birmingham.[4]

¶21. After the arrest, Officer Branch called Sergeant Lewis with the Columbus Police Department to see if Armistad had any active warrants in Mississippi. Officer Branch then told Sergeant Lewis about the fourteen-mile chase after Armistad across Pickens County, Alabama. When Officer Branch mentioned the spent .40-caliber Smith & Wesson Wolf bullet with red tint, Sergeant Lewis told him to hold Armistad.

¶22. Later, Officer Branch brought the items retrieved from the chase to the Pickens County jail. He saw Armistad at the jail, and he was no longer wearing a white t-shirt. Officer Branch testified, "[Armistad] had placed the [t]-shirt in the commode and was stopping the commode up, with water running under the jail cell when I arrived."

¶23. On January 4, 2021, Pastor Jordan Lawler of Ethelsville Baptist Church found a rifle and an extra grip on the side of the road across from the church and in front of the parsonage where he lived. Pastor Lawler testified about how he noticed the rifle. He said that as he was turning out of his driveway in his car, he saw some men standing around talking in the

---

[4] No gunshot residue test was done when the officers stopped Armistad. The officers were not aware of any reason to do so.

church parking lot. He stopped his car and walked over to them to make sure everything was okay. He said that the road in front of the church and his house had a good bit of traffic and that people often stopped in the parking lot. He did not think the men were doing something wrong; he just wanted to make sure they did not need anything.

¶24. As Pastor Lawler was walking back to his car, he noticed something on the side of the road back in the direction of his house. He walked over there and discovered that it was a rifle. A few feet away from the rifle, Lawler found an additional grip for a gun. He called the sheriff's department. The rifle was later identified as a Spikes Tactical model ST-15 multi-caliber rifle.

¶25. Officer Branch testified that he reviewed the security video from the church. He explained that the Challenger "was going too fast for the motion detector to catch the vehicle coming by," so it did not show up on the security video. The patrol car he was driving was not going as fast, so it did appear in the security video.

### C. Other Physical Evidence

¶26. Dr. David Arboe testified as an expert in forensic pathology. He performed Edwards's autopsy and found two gunshot wounds on his body: one to the chest and the other to the left buttock. Dr. Arboe testified that the bullet to Edwards's chest fractured his sternum, perforated his heart and right lung, and fractured some ribs before exiting through Edwards's back. A bullet fragment was recovered from near the exit wound, but the crime lab could not match it to or exclude it from any firearm. The bullet that entered Edwards's left buttock perforated tissues of the buttock and left leg before exiting near the groin. Dr.

Arboe determined the cause of death was gunshot wounds to the chest and left buttock, and he determined the manner of death was homicide.

¶27. Dr. Arboe testified that he could not tell whether the gunshots came from different directions but that the bullet causing the chest wound appeared to enter at the front and move to the back, and the bullet causing the buttock wound entered in the back and moved toward the front. He could not tell from an entry wound alone what size bullet made the wound.

¶28. Scott Gilliam, manager of the digital forensics laboratory for the University of Alabama Police Department, testified as an expert in the field of digital forensics. The cell phone recovered in Alabama was damaged when it was taken into evidence, but it was repaired to the point of being operational. Gilliam was able to perform a full extraction from the cell phone. He testified that the cell phone was registered to an email address for "Kenny Wayne" at armistadkenny21@gmail.com.

¶29. Photos from the phone were of Armistad. Other photos retrieved from the phone appeared to be photos of the Spikes Tactical rifle found in Alabama. Eric Warren testified as an expert in the field of firearms identification. Warren was contacted by the Lowndes County District Attorney's Office to compare the photos of the rifle recovered by police with the photos of a similar rifle from the phone. Warren testified that he compared the photos, noting both general class characteristics as well as unique characteristics. He testified about distinct similarities between the rifle in the two sets of photos. These similarities included areas of damage, modifications, and specific accessories. Warren concluded that the rifle in the images from the phone appeared to be the same rifle depicted in the photos from the

10

Columbus Forensics Laboratory.

¶30. Regarding messages from the phone, one text message in the phone was from "Mayor Dick Cheney" that said, "Stay dangerous bino I love u." "Bino" is the same name or nickname that Raekwon heard Edwards say before the shooter opened fire. "Kenny Armistad" replied, "Already mob let me know if you see vento." "Mayor Dick Cheney" responded, "You knw i love you to death Wayne . . . ." An outgoing message at 6:15 p.m. on December 30, 2020, stated, "Make sure I ain't got none in the house. Police ran in all Jaybo cribs," and an incoming message at 7:00 p.m. from "William Miller" stated, "What's up with it, Bino? Did everything happen like it's supposed to?"

¶31. Other text messages extracted from the phone appeared to show Armistad and someone else discussing "air lift[ing]" someone and "get[ting] on out of town" on December 21, 2020, just over a week before Edwards's murder. Another message that same day read, "Let's hit these N-word and get on down. I'm sick of laying low"; Armistad responded, "Yes. Me too. Let's do it"; and a response to that stated, "We gone link once it get dark." Another message from Armistad said that they needed "to install fear" and that there were "too many playas in the city."

¶32. The day before the murder, Armistad and another person discussed carrying "irons" (weapons) and "sticks" (magazines)[5] and "get[ting] some extra bullets for the sticks." Armistad told them that someone said he would give them cash and a truck if they "get that big" guy. The response was that they needed to find a new car because "they know my whip.

---

[5] Gilliam testified that in his experience, "Sticks represents magazines" and "irons" represents "[w]eapons."

We just gotta find a whip.[6] I'll pay 100 just to use it, right?" And Armistad replied, "I can see can I find one." In a message sent two days before the murder, the person sending messages from Armistad's phone referred to himself as "the old kennywayne." During cross-examination, Gilliam was asked if messages and pictures from the "cloud" could appear from the different phones if multiple people use the same Apple ID and password. Gilliam said that the phone would have to be "synched that way. It's not an automatic process." Gilliam explained that although it could happen, in his experience people do not share phones.

¶33. Gregory Bell of the Mississippi Bureau of Investigation testified as an expert in the field of geographical-location-systems analysis. Ball reviewed call-detail records from the cell phone. He analyzed the cell phone locations based on the cell tower used for each phone connection, the range of that tower's sector, and a range of the cell phone's estimated location. Bell prepared and testified about a series of slides that mapped the location of the cell phone towers used and the estimated area of the cell phone during periods of activity beginning at 6:32 p.m. on the evening of the shooting.

¶34. Bell testified that from 6:32 to 8:10 p.m. the cell phone was being used from an area that did not cover the crime scene. At 8:16 p.m., the cell phone moved into a sector that covered the crime scene. The next time the cell phone was used was 9:26 p.m. The use was from a tower in the crime scene area.[7] Bell testified that between 8:16 p.m. and 9:26 p.m.,

---

[6] When asked what "whip[]" meant, Gilliam testified that in his experience, it typically means "[a] ride for people."

[7] Bell explained that the cell phone location was "definitely within [a sector] of a [particular] tower," though this was not a precise location.

the cell phone was not communicating with a tower, so it was either off or in "airplane mode." During cross-examination, Bell acknowledged that this might possibly mean that the cell phone had a dead battery, but the cell phone records indicated there was a significant spike in calls (including calls that rolled over to voicemail) and text messages to and from the cell phone in the 9:00 p.m. hour.[8] Bell explained that this was likely because the phone was off or on airplane mode for some time.

¶35. At 9:27 p.m., the phone was "handed off" to another tower with a better signal that was within three miles of the crime scene, and the cell phone signal continued to be "handed off" to other cell towers within that range until approximately 9:30 p.m. At 9:39 p.m., there was "a significant change in the section direction," indicating movement. By 9:50 p.m., the phone "drop[ped] down to a tower that's south of everything," and Bell elaborated, "What that kind of shows me is even further movement eastward." Bell testified that by 10:04 p.m., the phone was communicating with a tower in Alabama. At 10:12 p.m., the cell phone was within the same calling area as the Ethelsville Baptist Church.

¶36. The State recalled Officer Branch, who testified that he had reviewed the investigative file for the purpose of noting when the 911 call was made on December 30, 2020, reporting the murder of Frank Edwards. He testified that the call was made at 9:04 p.m. Officer Branch then testified that he encountered Armistad in Pickens County at approximately 10:00 p.m., and he (Officer Branch) made a 911 "hot pursuit" dispatch call at 10:09 p.m.

¶37. The State rested.

---

[8] The 911 call about the shooting was received by Columbus Police Department dispatch at 9:04 p.m.

## II.    The Defense's Case

¶38.    After the State rested, the defense moved for a directed verdict, which was denied. The defense called Armistad's cousin, Kierra Wallace, as a witness. She testified that she had never heard Armistad called "Bino." She said she had heard, "What's up Bino," used a couple of times as a colloquial greeting at school. Wallace was shown the State's Exhibit 46, which was a photograph of the rifle found outside Ethelsville Baptist Church in Alabama. She denied that she had ever seen the rifle in Armistad's possession.

¶39.    Wallace also testified that she was with Armistad at their grandparents' home the day of the murder from about 1:00 p.m. until about 9:15 p.m., and then he left and headed for Alabama, where he stayed and worked. Their grandparents' home was located at 314 Kidd Road in Caledonia, Mississippi. Wallace did not give that information to the defense until August 2022 (two years after the murder), and she had no explanation as to why she waited that long.

¶40.    The defense also called Captain Rick Jones with the Columbus Police Department. He testified that he assisted in the investigation and took a statement from Xavier Martin because the police had seen a social media post that Edwards owed Martin money. Captain Jones explained that they tracked down that lead. They excluded Martin as a person of interest after the police talked with him and clarified that Edwards had paid Martin the money. Martin told the police that he had assured Edwards's mother that "everything was smoothed and taken care of." Captain Jones testified that he was "very confident" in excluding Martin as a person of interest in Edwards's murder.

14

¶41.   The defense rested.

**III.    The State's Rebuttal**

¶42.   The State called Investigator Maurice Johnson as a rebuttal witness.  He testified that the 314 Kidd Road address in Caledonia is approximately 6.6 miles north of Steens, Mississippi.

¶43.   The State finally rested.

**IV.    The Jury Verdict and the Post-Trial Motion**

¶44.   The trial court instructed the jury, followed by closing arguments.  The jury found Armistad guilty of all four counts against him, and the trial court sentenced Armistad as set forth above.   The trial court denied Armistad's post-trial motion for judgment notwithstanding the verdict or, alternatively, a new trial.  Armistad appealed.

**DISCUSSION**

**I.    Insufficiency of the Evidence**

¶45.   Armistad asserts that the evidence was insufficient to support all four convictions: Count I (murder of Edwards), Count II (aggravated assault of Raekwon), Count III (aggravated assault of Elijah), and Count IV (possession of a firearm by a felon).  "An appeal of the trial court's denial of a directed verdict or judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence that is subject to a de novo standard of review." *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022).  "In reviewing the sufficiency of the evidence, this Court views all evidence in the light most favorable to the State[.]" *Id.* Specifically, "[this Court] will reverse and render judgment in favor of the defendant only

15

if the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty . . . ." *Id.* (internal quotation marks omitted) (quoting *Young v. State*, 119 So. 3d 309, 315 (¶18) (Miss. 2013)). "The relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Young*, 119 So. 3d at 315 (¶18) (internal quotation marks omitted).

¶46. Because this is a circumstantial evidence case, we also recognize that "[c]ircumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence, and, in fact, a conviction may be had on circumstantial evidence alone." *McCray v. State*, 263 So. 3d 1021, 1029 (¶25) (Miss. Ct. App. 2018) (internal quotation marks omitted). Further, "the jury may draw any reasonable inferences from all the evidence in the case." *Id.*

### A. Count I (murder of Edwards) and Count II (aggravated assault of Raekwon)

¶47. Armistad asserts that the evidence is insufficient to support the convictions of Count I (murder of Edwards) and Count II (aggravated assault of Raekwon) because the State presented insufficient evidence to prove beyond a reasonable doubt that he was the shooter or that he was present at the scene and aided, assisted, or encouraged the shooter.[9] We are not persuaded by Armistad's assertions. Taking the evidence in the light most favorable to the State and accepting all reasonable inferences that can be drawn from that evidence, we

---

[9] Armistad makes the same argument with respect to Count III (aggravated assault of Elijah), but he also makes additional arguments with respect to Count III, so we separately address that Count.

find that the State presented sufficient evidence to show that it was Armistad who shot and killed Edwards and who caused bodily injury to Raekwon by shooting him.

¶48.　Both eyewitnesses, Raekwon and Elijah, testified that a dark car pulled up at Elijah's house and that a passenger wearing a white t-shirt got out of the car, spoke to Edwards, and then opened fire. Raekwon testified that Edwards addressed that person as "Bino." A text message on Armistad's phone from "Mayor Dick Cheney" to Armistad also referred to Armistad as "bino." When Armistad was arrested, he was wearing a white t-shirt. Officer Branch testified when he later saw Armistad in the Pickens County jail, Armistad had stuffed the white t-shirt "in the commode and was stopping the commode up, with water running under the jail cell" when Officer Branch arrived.

¶49.　Armistad points out that "a white t-shirt is extremely common," his cousin testified that she had never heard anyone call him "Bino," Raekwon did not tell Investigator Smith about the "Bino" greeting in Raekwon's initial statement, and when Armistad was later arrested in Alabama, he was alone in a maroon Dodge Challenger (not a passenger in the "dark-colored gray Mazda" that Raekwon and Elijah said drove up to Elijah's house earlier that evening). These points, however, go to the weight of the evidence, not its sufficiency. "[T]he jury is the sole judge of the weight of the evidence and the credibility of the witnesses, and conflicts in the evidence are for the jury to resolve." *Boyd v. State*, 383 So. 3d 1280, 1290 (¶47) (Miss. Ct. App. 2024).

¶50.　The State also presented testimony about Armistad's behavior leading to and following his arrest in Alabama and testimony concerning physical evidence found at the

17

scene and along the chase route. A jury could reasonably infer from this evidence that Armistad was connected to Edwards's killing. *Hampton v. State*, 309 So. 3d 1055, 1062 (¶33) (Miss. 2021) (recognizing that "the jury may draw any reasonable inferences from all the evidence in the case"). Officer Branch testified that he saw Armistad speeding and driving erratically about three miles into Alabama from Lowndes County, Mississippi. He tried to pull over Armistad, but Armistad did not stop. A high-speed chase ensued. During the chase, Officer Branch and his partner, Officer Jody Elmore, saw Armistad throw items from his car. Three items were found in the areas where the officers saw Armistad throw them: A white U-Pass box containing a .40-caliber Smith & Wesson Wolf bullet that matched casings found at the scene of Edwards' death; a cell phone registered to "Kenny Wayne" at armistadkenny21@gmail.com, which contained photos of Armistad; and an "extended magazine" that fit a pistol.

¶51. Officer Branch testified that he briefly lost sight of Armistad's car near Ethelsville Baptist Church. Five days after Armistad had driven by the church, the church's pastor found a rifle and extra grip on the side of the road across from the church. The rifle was later identified as a Spikes Tactical model ST-15 and had a distinctive red spider logo. Nine of the casings recovered from the crime scene matched the rifle found near Ethelsville Baptist Church. The cell phone contained pictures of a .40-caliber Smith & Wesson Wolf bullet—the same type of bullet found in the box thrown from Armistad's car. The cell phone also had a photo of a rifle that appeared to be the same gun found near Ethelsville Baptist Church.

18

¶52. Armistad, however, points out that the rifle was not found until five days later, Pastor Lawler testified that a "good bit" of traffic passes by the area each day, and two men were in the church parking lot when the pastor noticed the rifle on the other side of the road.[10] Armistad also notes that "[a]lthough a Wolf .40[-]caliber Smith & Wesson casing with a red primer was recovered at the scene and a Wolf .40 caliber bullet with a red primer was found along the route of Branch's pursuit of Armistad," the jury also heard Captain Jones's testimony that "the Wolf .40[-]caliber Smith & Wesson bullet was popular at the time and the red marking on the primer was a 'wax-type casting' from the Wolf manufacturer common to all Wolf bullets." We again observe that these points go to the weight of the evidence, not its sufficiency.

¶53. Armistad makes three additional challenges to the "sufficiency of the evidence" that he was the shooter or aided and abetted the shooting. We find that each argument, like the other points made by Armistad, go to the weight of the evidence and not its sufficiency. First, Armistad questions whether the Columbus Police Department adequately followed up on its lead concerning a social media post revealing Edwards owed money to Xavier Martin. The jury, however, heard Captain Jones's testimony on this point, including his testimony that he was "very confident" in excluding Martin as a person of interest in Edwards's murder. He explained that Martin was excluded as a person of interest after the police interviewed him and clarified that Edwards had paid Martin the money he owed him.

---

[10] To place this point in context, Pastor Lawler also testified that these two men were "just standing around talking." He did not believe the men were doing anything wrong; he just stopped to check to see if they needed anything.

¶54. Second, Armistad notes his cousin's testimony that on the day of the shooting he was with her at their grandfather's birthday party at 314 Kidd Road in Caledonia (northeast of Columbus, Mississippi) from 1:00 p.m. until about 9:15 p.m., when he then left for Alabama. But the jury also heard Bell's testimony and viewed his slide presentation regarding Armistad's whereabouts that evening based upon Bell's analysis of Armistad's cell phone data.

¶55. As we have detailed above, that cell-tower triangulation data placed Armistad's cell phone within a sector covering the crime scene in Columbus at 8:16 p.m. The cell phone was not communicating with a tower between 8:16 p.m. and 9:26 p.m. At 9:27 p.m., the cell phone was communicating with a tower within three miles from the crime scene until approximately 9:30 p.m., and then the cell phone communication "dropped down to a tower that [was] south of everything," demonstrating even "further movement eastward." The slides presented to the jury show that the 314 Kidd Road address was not within any of these mapped sectors.

¶56. Third, Armistad suggests Elijah could have shot Edwards. Elijah testified at trial that "once the first couple of shots let out, I seen [Edwards] hit the ground and that's when I returned fire." He further testified that he did not return fire until he saw "[Edwards] hit the ground." Elijah admitted during cross-examination that in a statement given to Sergeant Lewis he said, "I just hope I didn't hit him [(Edwards)]." Armistad relies on this acknowledgment to support his argument, but he ignores Elijah's testimony during redirect examination on this issue. Elijah clarified that at the time he made that statement to Sergeant

Lewis, he only knew Edwards had been shot, not that he had been shot in the chest and back. Elijah confirmed that Edwards was facing the person who shot him and that from where Elijah was standing, he (Elijah) could not have shot Edwards in the back. It is the jury's role, not the role of this Court, to assess Elijah's credibility and resolve any conflicts if necessary, and we do not disturb jury findings just because conflicting evidence existed.

¶57. In sum, we recognize that linking the physical evidence to Armistad and the crime scene required the jury to make some inferences. For example, the jury was required to infer that the items recovered from the road were the items thrown from Armistad's car; that the Smith & Wesson Wolf bullet with the red casing in the white U-Pass box matched the Smith & Wesson Wolf casings found at the scene; that the cell phone belonged to Armistad; and that the rifle—found in the one area where the officers lost sight of Armistad and that was later linked to the crime—was thrown by Armistad during the chase. We find that these are reasonable inferences for the jury to draw. Viewing the evidence presented in the light most favorable to the State and affording the State "all favorable inferences reasonably drawn from the evidence," *Henderson v. State*, 323 So. 3d 1020, 1026 (¶19) (Miss. 2021), we find that the State presented sufficient evidence to prove that Armistad murdered Edwards and committed an aggravated assault against Raekwon.

### B.    Count III (aggravated assault of Elijah)

¶58. We find that the evidence discussed above is also sufficient to prove that Armistad shot at Elijah and therefore committed an aggravated assault against him for attempting to cause bodily injury with a deadly weapon. *See* Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev.

21

2020). Armistad also asserts with respect to Count III that the evidence was insufficient to prove beyond a reasonable doubt that he specifically attempted to cause bodily injury to Elijah.[11] We disagree for the reasons addressed below.

¶59. Section 97-3-7(2)(a)(ii) provides that "[a] person is guilty of aggravated assault if he or she . . . attempts to cause . . . bodily injury to another with a deadly weapon . . . ." "For an attempt crime, an intent to commit the particular crime must be established." *McCray*, 263 So. 3d at 1029 (¶25). The requisite "[i]ntent may be established by inference from circumstantial evidence." *Id.* In *Jerome Brown v. State*, 326 So. 3d 530 (Miss. Ct. App. 2021), *Edmond Brown v. State*, 157 So. 3d 836 (Miss. Ct. App. 2014), and *McCray*, the defendants argued that they were not guilty of aggravated assault against a purportedly unintended, uninjured victim, as Armistad asserts here. In each case, however, the Court rejected that argument. We find that the circumstances in these cases are analogous to those concerning Elijah in this case.

¶60. In *Jerome Brown*, the defendant "was convicted of four counts of aggravated assault after he fired a gun multiple times into a vehicle occupied by four people." *Jerome Brown*, 326 So. 3d at 531 (¶1). On appeal, Brown asserted that three of the convictions "must be reversed because he only intended to shoot one of the car's occupants and did not injure or

---

[11] Armistad asserts that the doctrine of transferred intent does not apply in this case. "Under the doctrine of transferred intent, the malicious intent of the unlawful act directed toward one person is transferred to the other person." *Craig v. State*, 201 So. 3d 1108, 1112 (¶12) (Miss. Ct. App. 2016). As discussed above, we find that reasonable and fair-minded jurors could infer that Armistad intended to hit and injure (or kill) *all three men* when he saw them standing together and fired multiple shots at them. As such, the State did not need to rely on a transferred-intent theory to support the conviction for Elijah's aggravated assault. Thus, we need not address Armistad's assertions on this point.

intend to injure the other three occupants." *Id.* The Court disagreed, finding that the evidence was sufficient for the jury to find that Brown was guilty of aggravated assault against all four victims "when he pursued the vehicle occupied by the victims and fired multiple shots into the vehicle." *Id.* at 534 (¶15). Additionally, "[a]ll four victims testified that they feared for their lives, and . . . [two of the purported unintended victims] testified that they ducked to avoid the bullets coming into the vehicle." *Id.* at 533 (¶12).

¶61. Similarly, in *Edmond Brown*, the defendant was found guilty of aggravated assault against Cedric Glover after shooting a gun multiple times into a vehicle being driven by Cedric. *Edmond Brown*, 157 So. 3d at 838 (¶11). Brown sought reversal of his conviction for aggravated assault against Cedric because the evidence showed that his only "intended target" was Frederick Glover, a passenger in the vehicle. *Id.* at (¶10). According to Brown, "he 'never attempted to do bodily injury, serious or otherwise,' to Cedric." *Id.*

¶62. The Court rejected Brown's argument, finding that "a reasonable jury could have found Brown guilty of the aggravated assault of Cedric" when "[n]umerous eyewitnesses testified that as Cedric was driving away, multiple shots were fired at the car in an apparent attempt to stop the driver from leaving the parking lot." *Id.* at (¶11). Additionally, "bullet holes [were found] in the car's bumper and in the driver's side door, and two spent projectiles were recovered from the trunk and by the driver's side door of the car." *Id.*

¶63. Lastly, in *McCray*, the State presented circumstantial evidence that the defendant shot Glentez Brown while Brown was holding his infant son. *McCray*, 263 So. 3d at (¶¶2-8). The autopsy showed that Brown died as a result of the gunshot wounds; his infant son was

not injured. *Id.* at (¶¶4, 9). McCray was convicted of first-degree murder of Brown and aggravated assault against the infant. *Id.* at 1025 (¶10). McCray argued on appeal the evidence was insufficient to sustain the aggravated-assault conviction because "there was no proof that he possessed the intent required for attempted aggravated assault" against the infant. *Id.* at 1028 (¶23). The Court disagreed, finding that "reasonable and fair-minded jurors could have inferred from the evidence that McCray shot Brown . . . [while] Brown was holding his infant son . . . and that McCray thus possessed the intent to commit aggravated assault, that is he attempted to inflict serious bodily injury with a deadly weapon . . . upon the baby." *Id.* at 1029 (¶26).

¶64.    In this case, as we have discussed above, a jury could reasonably infer that Armistad was the shooter and that he fired multiple shots at Raekwon, Elijah, and Edwards, who were all standing close together. We find that the jury could likewise reasonably infer that Elijah was afraid he would be killed or injured. Elijah testified that he carried his weapon "for protection." When the shooting started and he saw Edwards "hit the ground," he was "like, wow, and [his] first reaction was just to start shooting." He "let off a couple of shots" and then sought cover in the house. In short, Armistad saw three men standing near the house and opened a barrage of gunfire on them. We find that a jury could reasonably infer that Armistad intended to hit and injure (or kill) all three men. Elijah was in fear of harm, at the very least. Accepting as true all the evidence favorable to the State and allowing for all reasonable inferences, we find that the State presented sufficient evidence for the jury to find Armistad guilty of aggravated assault against Elijah.

## C. Possession of a Firearm by a Felon

¶65. Armistad asserts that his felon-in-possession-of-a-firearm conviction should be reversed because the State failed to present sufficient evidence that he possessed the rifle in Lowndes County, Mississippi. We disagree. Given the evidence we have already discussed, we find that there is sufficient evidence for the jury to find that Armistad possessed a firearm in Lowndes County.[12]

¶66. Armistad asserts that the State presented no direct evidence linking him to the gun found in Alabama, and he again attacks the weight of the evidence, not its sufficiency, by repeating the same points he raised above concerning the rifle's recovery five days after the chase. It bears repeating that it is the jury's role to weigh the evidence and resolve any conflicts in the evidence. We find that the circumstances of Armistad's arrest and the discovery of the rifle that we have already discussed were sufficient for the jury to reasonably infer that the gun found across from Ethelsville Baptist Church in Alabama was thrown by Armistad.

¶67. Armistad also points out that Deputy Branch did not see Armistad possess the rifle in Lowndes County; he did not see Armistad's vehicle until it was three miles into Alabama. As we have already discussed, however, the rifle was later linked to the crime scene in Lowndes County.

¶68. Taking this evidence and all reasonable inferences to be drawn from it in the light most favorable to the State, we find that the State presented sufficient evidence that

---

[12] Armistad stipulated that he was a felon.

25

Armistad, a felon, possessed a firearm in Lowndes County.

## II.    Mistrial

¶69.    Armistad asserts that there were several instances that occurred during the trial proceedings "that substantially and irreparably compromised Armistad's right to a fair trial by an impartial jury and warranted the grant of a mistrial."  Armistad moved for a mistrial with respect to one of these instances, which the trial court denied.  Armistad did not move for a mistrial with respect to the remaining instances that he asserts warranted a mistrial.  For the reasons addressed below, we find no abuse of discretion in the trial court's denial of Armistad's motion for a mistrial, and we further find no basis for requiring the trial court to declare a mistrial sua sponte with respect to the remaining instances.

¶70.    "This Court employs an abuse-of-discretion standard of review to determine whether a trial judge erred in denying a request for a mistrial."  *Scates v. State*, 388 So. 3d 564, 572 (¶23) (Miss. Ct. App. 2023) (internal quotation mark omitted), *cert. denied*, 389 So. 3d 1072 (Miss. 2024).  "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Hutto v. State*, 227 So. 3d 963, 984 (¶66) (Miss. 2017) (internal quotation mark omitted).

¶71.    Mississippi Rule of Criminal Procedure 23.5 sets forth the procedure and standard governing mistrials, as follows:

> Upon motion of any party, the court *may* declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by a party, a party's attorney(s), or someone acting at the behest of a party or a party's attorney(s), resulting in substantial and irreparable prejudice to the movant's case.

26

> Upon motion of a party or its own motion, the court may declare a mistrial if:
>
> > (a) The trial cannot proceed in conformity with the law; or
> >
> > (b) It appears there is no reasonable probability of the jury's agreement upon a verdict.

MRCrP 23.5 (emphasis added). "[T]he trial judge is permitted considerable discretion in determining whether a mistrial is warranted because the judge is best positioned to measure the prejudicial effect." *Parks v. State*, 930 So. 2d 383, 386 (¶8) (Miss. 2006).

### A. Armistad's Motion for a Mistrial

¶72. Following a break during trial, the State told the trial judge that Bailiff Ken Custard, who had not been in the courtroom, told the State that he had "inadvertently started speaking with one of the jurors" during the break.

¶73. Custard was questioned by the trial judge and the attorneys. Custard explained that he was in the parking lot on his lunch break when he saw a man he knew from a previous job. They engaged in small talk about getting older and various injuries and surgeries they had since they last saw each other, and then the man mentioned he was at the courthouse serving as a juror. At that point, Custard continued talking with the juror but told him they would not talk about the trial. Armistad's attorney asked Custard if he had been present for trial, and Custard said only to "look at the door [and] . . . just to check to see how they were doing . . . I spoke to nobody but my bailiffs." Custard specifically confirmed that he had not heard any testimony. Custard testified that he had no knowledge of the case because he had been downstairs with another judge, and he reported the conversation to the State out of an abundance of caution.

27

¶74. At this point, Armistad moved for a mistrial. The trial judge said that "out of an abundance of caution," he wanted to question the juror concerning his conversation with Custard. The juror, Douglas, confirmed that he and Custard talked during lunch about their "old age," and they had talked for fifteen or twenty minutes. When asked by the trial judge whether they had discussed anything about the case, Douglas responded, "Absolutely not." Douglas testified that his interaction with Custard would not pressure him in any way in his deliberations.

¶75. After Douglas's testimony, the State agreed that Douglas should be replaced with an alternate juror out of an abundance of caution. Armistad still wanted a mistrial. The trial judge took a break to consider Armistad's motion and the testimony he had heard. The trial judge denied Armistad's motion but removed Douglas as a juror and replaced him with an alternate. The trial judge specifically noted "that there's a reason why the Court doesn't let the alternates know who they are so they'll pay attention [during trial] just as they were an actual juror."

¶76. Upon review, we find that the trial judge's decision to deny Armistad's mistrial motion was not an abuse of discretion. We find nothing in the record that Douglas's conversation with Custard had caused "substantial and irreparable prejudice to the defendant's case." Both Custard and Douglas assured the attorneys and the trial court that their conversation was not about the trial, Douglas did not remain as a juror, and there was no evidence that the other jurors or alternates knew about the improper contact.

### B. Other "Instances" Armistad Relies on in Asserting a Mistrial

28

¶77. Armistad describes three other "instances" surrounding his trial that he asserts "substantially and irreparably compromised [his] right to a fair trial by an impartial jury and warranted the grant of a mistrial." Armistad acknowledges that his trial counsel did not move for a mistrial with respect to these instances. Armistad asserts, however, that the trial court committed "plain error" by failing to sua sponte declare a mistrial based upon the cumulative effect of these instances.

¶78. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." *Burdette v. State*, 110 So. 3d 296, 303 (¶23) (Miss. 2013). In order "[f]or the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* We do not find these circumstances here. Accordingly, we are not persuaded by Armistad's assertions on this point.

¶79. The first instance Armistad describes occurred outside the courthouse prior to voir dire. The trial court informed the lawyers for the State and the defense that there had been "something" going on outside the courthouse between the victims' family members and the defendant's family members, and police had been called to break up a situation between them. The trial court told the lawyers to tell the families to stop it. Armistad asserts that this instance "served as precursor" of events that "eroded [the] impartiality and . . . fairness of the whole proceedings." We do not find that this instance warrants a sua sponte mistrial ruling, particularly under the "plain error" standard of review applicable here. Even

29

Armistad describes it as a "precursor" to subsequent events that purportedly led to unfairness in the proceedings.

¶80. The second instance happened during voir dire when a veniremember—who was not selected as a juror—informed the trial court that Edwards's mother "approached her in the hallway." The veniremember explained to the court that she is a school counselor and that Edwards "was one of [her] students." She assured the trial court she could be fair and impartial in the case, and neither party sought more information about this interaction. She was later stricken for cause. We find no basis for the trial court to declare a mistrial sua sponte based on these circumstances.

¶81. The third instance Armistad describes is when the trial court announced in open court that the bailiffs thought they might have seen an audience member recording the proceedings. The court asked the gallery members whether they knew anything about it. The record reflects that they indicated they did not know anything. Armistad's counsel said he "thought" he may have seen someone recording, and the prosecutor said someone told him it may have happened. The trial court instructed counsel for both sides to attempt to find out whether anything was recorded. If they found that there had been a recording, they were to see that it was deleted.

¶82. Armistad asserts that the potential recordings "threatened Armistad's right to a fair trial by an impartial jury and created real risks of juror or witness intimidation." Armistad cites *Smith v. State*, 158 So. 3d 1182 (Miss. Ct. App. 2015), for the observation that "Rule 4 of the Mississippi Rules for Electronic and Photographic Coverage of Judicial Proceedings

30

'places limitations on the use of the technology to prevent disruption [*and to*] *protect jurors . . . .*'" *Id.* at 1185 (¶13) (emphasis added in Appellant's Brief) (quoting *In re WLBT Inc.*, 905 So. 2d 1196, 1199 (¶7) (Miss. 2005)).

¶83. In *Smith*, the defendant claimed the trial court erred in denying his motion for a mistrial "after an employee from the sheriff's department was seen taking photographs in the courtroom during the trial." *Id.* at (¶12). "Smith claimed that the employee was taking pictures of the jury, which caused intimidation and affected their decision." *Id.* The Court found no abuse of discretion in the trial court's finding that a mistrial was not warranted, observing that "[t]here [was] no evidence that the jury was intimidated by the photographer[,] . . . [and] the judge was in the best position to determine the prejudicial effects of the employee's conduct in the courtroom." *Id.* at 1185-86 (¶13).

¶84. Armistad asserts that his case is different from *Smith*, pointing to a newspaper clipping that was attached to his post-trial motion providing that four men had been arrested on March 3, 2023,[13] for making "terroristic threats" or for "intimidating judge, juror, witness, attorney." But we find no evidence in the record about what relationship, if any, these men had to the trial or any evidence of where the arrests occurred. There is no evidence of the circumstances surrounding the arrests, the grounds for the charges, or whether anyone connected to the trial knew they had occurred.[14]

---

[13] Armistad's trial took place from February 27, 2023, to March 3, 2023.

[14] To the extent Armistad asserts that the trial court erred in failing to grant a new trial based upon these arrests and "the environment outside and inside the courthouse," we find such assertion without merit. "We review for clear error 'a trial court's finding that a jury was fair and impartial.'" *Kelly v. State*, 370 So. 3d 535, 537 (¶6) (Miss. Ct. App. 2023)

¶85. Like in *Smith*, we reject Armistad's argument that he was prejudiced by any purported video recording of the trial. We find no evidence that any juror was intimidated by any purported video recording. Indeed, even if there had been video recordings, there is no evidence that the jury had been recorded or that any juror even knew that any video recording was taking place. With respect to any potential effect on the jury, we reiterate the same point we recognized in *Smith*: "[It is the trial] judge [who] was in the best position to determine the prejudicial effects" of any purported video recording in the courtroom. *Id.* at 1185-86 (¶13).

¶86. In sum, "[m]istrials should only be declared sua sponte when manifestly necessary." *Arrington v. State*, 267 So. 3d 753, 758 (¶17) (Miss. 2019). Examples recognized by the supreme court "where a declaration of a mistrial would likely be a manifest necessity [include]: failure of a jury to agree on a verdict; a biased or otherwise tainted jury; improper separation of the jury; [and] where jurors . . . failed to follow instructions." *Id.* In this case, we find that none of the instances described by Armistad, whether independently or considered as a whole, rise to this level. Accordingly, we find no abuse of discretion, and certainly no plain error, in the trial court declining to declare a mistrial sua sponte based on the above-described instances, whether considered independently or collectively.

### III. Prosecutorial Misconduct

(quoting *Watts v. State*, 350 So. 3d 613, 617 (¶19) (Miss. 2022)). In this regard, "[i]t is a judicial question as to whether a jury is fair and impartial, and the court's judgment will not be disturbed unless it appears clearly that it is wrong." *Id.* Here, we find that Armistad has failed to show in any way that these arrests had an adverse effect on the trial or on the members of the jury. Accordingly, we find no reversible error in the trial court's denial of Armistad's request for a new trial based upon this point.

¶87. Armistad asserts that he is entitled to a new trial because the State committed two instances of prosecutorial misconduct during voir dire and closing arguments. We are not persuaded by Armistad's assertions for the reasons we address below.

¶88. As an initial matter, because Armistad "did not object to the alleged improper statements, the assignment of error has been waived and his arguments are barred procedurally on appeal." *Ambrose v. State*, 254 So. 3d 77, 129 (¶163) (Miss. 2018).[15] To the extent Armistad asserts that the State's arguments constituted "plain error," we are guided by the following standard: "[T]he plain-error doctrine is applied to closing arguments only when the substance of the statement is out of bounds for closing arguments." *Id.* at (¶161) (internal quotation marks omitted).

¶89. Typically, the issue presented in an allegation of "lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000). But when no contemporaneous objection is lodged, as here, our standard of review is more limited. We review the claim only if "the alleged prosecutorial misconduct was so

---

[15] Armistad objected during the State's closing argument that the prosecutor's remarks had "nothing to do with the testimony," but this was not with respect to the statements he alleges were improper in this appeal, nor did he assert in his objection that misconduct had occurred. "Asserting grounds for an objection on appeal that differ from the ground given for the objection at the trial level does not properly preserve the objection for appellate review." *Taylor v. State*, 367 So. 3d 228, 238-39 (¶32) (Miss. Ct. App. 2020). Armistad also did not raise any prosecutorial misconduct issues in his motion for a new trial. His prosecutorial misconduct claims are therefore waived. *Goff v. State*, 14 So. 3d 625, 651 (¶¶101-02) (Miss. 2009).

inflammatory that the trial court should have intervened on its own." *Ambrose*, 254 So. 3d at 130 (¶167). We also bear in mind that "[a]ttorneys generally are afforded wide latitude in arguing their cases to the jury . . . [and] [a]ny allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Id.* (internal citations and quotation marks omitted).

## A. Allegedly Seeking Promises Regarding Verdict

¶90. Armistad's first contention is that during voir dire, the prosecutor "impermissibly attempted to exact a pledge from the jury on a guilty verdict in the absence of direct evidence"; further, he contends the prosecutor sought to "solidif[y] this pledge" during closing arguments. We disagree. We now address the particular statements at issue.

¶91. During voir dire, the prosecutor explained to the venire the difference between direct and circumstantial evidence. He then told the members about his cousin who told him she would not be able to find someone guilty without direct evidence to prove it. Continuing, the prosecutor told the venire that if they felt the same way as his cousin did on this issue, to "please tell [him] that." Specifically, the prosecutor said:

> And I told [my cousin], that's okay. That's why I need to know . . . [and] if that's your belief, you need direct evidence to find someone guilty of a charge like this, . . . I'm asking you now you to please tell me that. Anybody share that view? They need—they have to have direct evidence to find somebody guilty. (No response). I don't see anybody raising their hands. So everybody understands circumstantial evidence can be, it must have happened. Anybody got any problem looking at circumstantial evidence? (No response).

¶92. During his closing argument, the prosecutor noted that one of defense counsel's "essential arguments" was that "there's no direct evidence against his client." On this point,

34

the prosecutor said, "Well, I told you on voir dire there was going to be no direct evidence and . . . I gave you the opportunity, if you've got to have direct evidence to find somebody guilty, you gotta tell me before we pick the jury. Nobody raised their hand." The prosecutor then explained:

> In murder cases, guess what, Ladies and Gentlemen, the person who commits the murder kills the best witness. . . . So probably the majority of my cases have relied on circumstantial evidence because generally, people don't kill other people in front of other people. . . . So you've got the legal obligation to consider all the circumstantial evidence and not just say, man, if I don't have direct evidence, I can't convict them because you've already said if you had to have direct evidence—you had the opportunity to raise your hand.

¶93. In support of his contention that these statements constituted prosecutorial misconduct, Armistad cites caselaw for the proposition that "[i]t is reversible error to ask a juror during voir dire to commit to returning a particular verdict." *Stringer v. State*, 500 So. 2d 928, 938 (Miss. 1986). In *Stringer*, "the prosecutor asked the jurors if they could return the death penalty under . . . [certain] conditions," such as if the defendant himself did not pull the trigger and kill the victim. *Id.* The supreme court found that it was reversible error when the prosecutor, "[d]uring closing argument, . . . characterized the jurors' negative responses to his voir dire as a promise, under oath, to return the death penalty in [the] case." *Id.*

¶94. We do not find that the circumstances in *Stringer* or similarly prejudicial circumstances happened here. We therefore reject Armistad's prosecutorial-misconduct contention on this point. We find instructive the supreme court's discussion of this issue in *Goff*, 14 So. 3d at 652-54 (¶¶110-12).

¶95. In *Goff*, the supreme court rejected the defendant's prosecutorial-misconduct

35

argument based on Goff's allegations "that during voir dire, the State sought a promise from the jury that they would be able to convict Goff even in the absence of DNA evidence." *Id.* at 652 (¶110). The alleged improper statements occurred during voir dire when the prosecutor asked the jurors if they watched CSI: Crime Scene Investigation, and then he asked:

> So, can everybody tell me—and, again, this kind of goes to the burden of proof, you know, about what evidence you have—and can everyone tell me that they will listen to the evidence and not speculate because they don't have, say, DNA or they don't have fingerprints and things you may see or hear about on CSI? Can everyone tell me they can do that? Yeah?

*Id.* at 652-53 (¶110). Then, "[d]uring closing arguments, the State reminded the jury of the question posed during voir dire," *id.* at 653 (¶110), as follows: "'You were asked in voir dire, you all know about CSI. Can you set that aside if it's not needed [(*e.g.*, DNA or fingerprints)] and return a verdict, and you all said yes. So we ask you to hold to that. It's not necessary here, and it's not needed. The evidence was overwhelming.'" *Id.* (quoting trial transcript).

¶96.   The supreme court found no prosecutorial misconduct under these circumstances, pointing out that unlike the prosecutor in *Stringer*, "[h]ere, . . . the prosecutor did not ask the jurors for a promise to convict, nor did he ask the jurors to ignore any piece of evidence; *rather, he asked the jurors to listen to the evidence and return a verdict based upon the evidence presented at trial.*" *Id.* at 653 (¶112) (emphasis added).

¶97.   We similarly find no prosecutorial misconduct in this case. The prosecutor did not ask the jurors to promise to convict Armistad or to ignore evidence; rather, the prosecutor

explained the difference between direct and circumstantial evidence and then asked the venire to tell him if they felt it necessary to have direct evidence to find someone guilty. In closing arguments, he reminded the jurors of their "legal obligation to consider all the circumstantial evidence and not just say, man, if I don't have direct evidence, I can't convict," after having confirmed their understanding of the significance of circumstantial evidence during voir dire. In short, like the prosecutor in *Goff*, the prosecutor in this case essentially "asked the jurors to listen to the evidence and return a verdict based upon the evidence presented at trial." *Id.* at 653 (¶112). Accordingly, we are not persuaded by Armistad's prosecutorial misconduct contentions on this point.

### B. Alleged Suggestion that Jurors Would Feel the Need to Explain a Decision to Acquit

¶98. Armistad also asserts that remarks made by the prosecutor during his closing argument were impermissibly "calculated to unduly influence the jury by suggesting" they would "need to explain their verdict." Upon review, we do not find that this is an accurate characterization of the prosecutor's remarks. Based on our review of these remarks, as stated in context, we find no prosecutorial misconduct.

¶99. The remarks Armistad complains of were as follows:

> BY [COUNSEL FOR THE STATE]:
> Ladies and Gentlemen, this is my favorite thing about being DA, . . . [d]oing closing arguments. . . . Because . . . I may see y'all again in passing. You may not even remember me. May not remember this moment, but y'all might see each other again in the future. Y'all might remember this, maybe don't. Maybe, say, oh, man, I—that's the DA we had in that murder trial, or, I served on a jury with this person, but this is a beautiful thing that y'all are doing. . . .
>
> I always tell people, I got enough to do. I don't need more people out here

committing murders. It's bad for me, but I've got an obligation to that man there (indicating picture of Frank Edwards). I gotta be Frank Edwards's voice. . . . .

That's why Eric Lewis did everything in [his] power to solve this case. That's why the Columbus Police Department did everything [in] their power. That's why I spent all this money getting these exhibits. That's why spent all this money getting this expert. I left no coin unturned to solve this case because I had to be Frank Edwards's voice. I owe that to those people over there. I told them when they came to my house when they shouldn't have—

BY [DEFENSE COUNSEL]:
Your Honor, I'm going to object to this. This has nothing to do with the testimony.

BY THE COURT:
I've allowed it a little bit, but you're wearing on the—

BY [COUNSEL FOR THE STATE]:
Thank you, Your Honor.

BY THE COURT:
Be careful, Mr. Colom.

BY [COUNSEL FOR THE STATE]:
Yes, Your Honor. I told them I would do everything in my power to get them justice . . . because that's my obligation as district attorney. That's my duty. . . . I'm confident that if you follow the evidence, you follow the evidence, it's clear that we found the shooter. . . . Frank Edwards isn't just a picture on a photo. He's not just a name on an indictment. He was a person. Find the Defendant guilty of all four counts.

¶100. Armistad contends that these remarks are akin to those found to constitute reversible error in *Sheppard v. State*, 777 So. 2d 659 (Miss. 2000). We disagree. In *Sheppard*, "the prosecutor stated [in his closing argument] that if the jury voted to acquit, he wanted them to call him and explain their rationale of finding the defense witnesses credible, so he could explain it to the victim's family." *Id.* at 661 (¶6). The trial court overruled the defense

38

counsel's objection to these statements. *Id.*

¶101. The supreme court found that the remarks "had nothing to do with the evidence presented during the trial"; rather, "[t]he purpose of the remarks was to prejudice the defense, as well as to give the jurors the impression that if they did not convict, the prosecutor was going to subject them to personal ridicule, embarrassment, and questioning." *Id.* at 662 (¶9). Because "the natural and probable effect of the prosecutor's improper statements was the creation in the minds of the jurors of an extra-legal burden of accountability to the State prejudicial to the rights of the accused," the supreme court held that the prosecutor's statements constituted reversible error. *Id.* at (¶10).

¶102. Thus, although the supreme court noted that the prosecutor's statements "had nothing to do with the evidence," the *basis* for the supreme court finding reversible error was in the prejudicial effect of the prosecutor's improper statements concerning the jurors "extra-legal burden of accountability to the State prejudicial to the rights of the accused." *Id.* at (¶10).

¶103. We find no such prejudicial effect resulting from the prosecutor's statements here. When Armistad's counsel objected to the prosecutor's statements on the ground that they had "nothing to do with the testimony," the trial court cautioned the prosecutor to "be careful," and the prosecutor moved on. Defense counsel made no objection as to the purported prejudicial nature of the prosecutor's remarks, nor do we find that the prosecutor's statements could reasonably be perceived as a threat to the jurors that if they did not convict, they could be "subject . . . to personal ridicule, embarrassment, [or] questioning." *Id.* at 662 (¶9). As such, we find that no prosecutorial misconduct took place in this instance.

¶104. In sum, Armistad did not object on prosecutorial-misconduct grounds to the prosecutor's statements that he now challenges on appeal. Considering the prosecutor's remarks in context, we find that none of the challenged statements were "so inflammatory that the trial court should have intervened on its own." *Ambrose*, 254 So. 3d at 130 (¶167). Further, even if specific objections had been lodged, we find no "unjust prejudice against [Armistad]" that "result[ed] in a decision influenced by the [purported] prejudice so created." *Sheppard*, 777 So. 2d at 661 (¶7). Accordingly, we find that Armistad's assignment of error based on these statements is without merit.

### IV.    No Jury Instruction on Self-Defense

¶105.  The trial court gave the State's elements instructions to the jury on Counts I, II, and III, which all included "not in necessary self defense" as an element of the crimes. The State had submitted a jury instruction defining self-defense but withdrew it. Defense counsel stated at the jury instruction conference that "maybe . . . we could submit this [self-defense] instruction because it's also one of the elements and it would help explain it."

¶106.  In response, the State explained that the self-defense instruction was submitted "just in case" the defense argued self-defense. The State then pointed out that the defense did not argue self-defense but, instead, argued that Armistad was not at the scene. So, the State argued, Armistad was "not entitled to this [self-defense] instruction."

¶107.  The trial court agreed and ruled that the self-defense jury instruction was "hereby withdrawn." Armistad asserts that this ruling was in error. We disagree for the reasons addressed below.

¶108. We review the denial or acceptance of a proposed jury instruction for abuse of discretion." *Willis v. State*, 352 So. 3d 602, 615 (¶38) (Miss. 2022). "A defendant is entitled to have jury instructions given which present his theory of the case, but the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, *or is without foundation in the evidence.*" *Id.* (emphasis added) (internal quotation marks omitted). "A criminal defendant also 'has a right to assert alternative theories of defense, even inconsistent alternative theories.'" *Figueroa v. State*, 337 So. 3d 1104, 1110 (¶19) (Miss. Ct. App. 2021) (quoting *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999)). A defendant, though, "must 'offer *some* evidence to support his . . . theory before the trial court [is] obligated to instruct the jury on it.'" *Id.* (emphasis added by *Figueroa*) (quoting *Nelson v. State*, 284 So. 3d 711, 718 (¶26) (Miss. 2019)). "A trial judge properly refuses a requested instruction that is not supported by the evidence." *Id.*

¶109. Armistad asserts that the trial court erred by allowing the self-defense jury instruction to be withdrawn after granting the elements instructions for Counts I through III that contained "not in necessary self defense" as an element of the crimes. He contends that by including this element, the trial court "implicitly held that the evidence supported the issue of self-defense." Upon review, however, we find no instance in which Armistad relied on a self-defense theory of defense, nor do we find evidence that would support that theory. Rather, Armistad's sole defense at trial was grounded in an alibi or mistaken identity.

¶110. Armistad asserts that the jury could have found that Armistad shot at Edwards and the Sherrod brothers in self-defense because "Elijah acknowledged that in his statement to

Officer Lewis, he said that he was already clutching his gun in his hand when the car pulled up." The full—and only—testimony from Elijah that Armistad relies on for his self-defense argument is as follows:

> [BY DEFENSE COUNSEL:]
> Okay. Do you remember telling the police in your recorded statement, telling Eric Lewis that when the car pulled up, that you had your gun—you clutched your gun. Do you remember telling him that?
>
> [BY WITNESS ELIJAH SHERROD:]
> Yeah. I had my—I had my hand on my gun.
>
> [BY DEFENSE COUNSEL:]
> So when the car pulled up, you had your hand on your gun; is that right?
>
> [BY WITNESS ELIJAH SHERROD:]
> Yes, sir.
>
> [BY DEFENSE COUNSEL:]
> *And did you pull it out—*
>
> [BY WITNESS ELIJAH SHERROD:]
> *No, sir.*
>
> [BY DEFENSE COUNSEL:]
> *Right then?*
>
> [BY WITNESS ELIJAH SHERROD:]
> *No, sir.*

(Emphasis added).

¶111. In *Willis*, the supreme court found no abuse of discretion in the trial court denying a self-defense jury instruction when "[n]othing in the record supports [the defendant's] theory that he was in imminent danger of suffering some great personal injury or death at the hands of [the victim]. The trial judge recognized this and denied the [self-defense] instruction."

42

*Willis*, 352 So. 3d at 616-17 (¶40); *see* Miss. Code Ann. § 97-3-15(f) (Rev. 2020) (defining justifiable homicide to include "a killing of a human being by . . . another . . . in the lawful defense of [his] . . . own person . . . , where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished."). The same circumstances are required for a defendant to rely on a theory of self-defense in the aggravated assault context. *See, e.g.*, *McKinley v. State*, 873 So. 2d 1052, 1055 (¶¶10-13) (Miss. Ct. App. 2004).

¶112. Upon review, we do not find that Elijah's testimony would allow a reasonable juror to conclude that Armistad shot at Edwards and the Sherrod brothers in self-defense. Elijah made clear in his testimony that he did not pull out his weapon before Armistad started shooting. As such, we do not find that Elijah's testimony supports the theory that "[Armistad] was in imminent danger of suffering some great personal injury or death at the hands of [Elijah]." *Willis*, 352 So. 3d at 616-17 (¶40). Armistad points to no other testimony or evidence to support his self-defense theory. Indeed, upon review, we find no testimony or evidence presented by Armistad or the State that would suggest that Armistad's shooting at Edwards, Raekwon, and Elijah was a response to Elijah's gunfire or that a shooting was imminent. Accordingly, we find no abuse of discretion in the trial court refusing a self-defense jury instruction when there is no evidentiary basis for it in the record.

## CONCLUSION

¶113. In conclusion, taking the evidence in the light most favorable to the State and accepting all reasonable inferences that can be drawn from that evidence, we find that

Armistad's four convictions are supported by sufficient evidence as we have detailed above. We further find no abuse of discretion in the trial court's denial of Armistad's motion for a mistrial, nor do we find any basis for requiring the trial court to have declared a mistrial sua sponte. Regarding Armistad's third assignment of error, for the reasons addressed above, we do not find that he is entitled to a new trial based on alleged prosecutorial misconduct. Finally, we find no abuse of discretion in the trial court's refusal of a self-defense jury instruction for the reasons we have addressed. Accordingly, Armistad's sentences and convictions are affirmed.

¶114. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**